# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HAL WAGNER STUDIOS, INC., | ) | |
| d/b/a WAGNER PORTRAIT GROUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CV-0031-MJR |
| | ) | |
| KRIS ELLIOTT, PAM ELLIOTT, | ) | |
| BRAD GUTIERREZ, | ) | |
| CINDY HARGRAVE, ROBERT BRAY, | ) | |
| PHIL WALKER, and | ) | |
| SHARON VANSAGHI, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ISSUING PRELIMINARY INJUNCTION

**REAGAN, District Judge:**

### A.  Background and Introduction

On January 9, 2009, Plaintiff Hal Wagner Studios (hereinafter "Wagner") filed this action against Defendants alleging ten counts (Doc. 2), including: (1) a claim for injunctive relief to enforce the non-compete agreement against Kris Elliott, (2) breach of contract claim against Kris Elliott, (3) a claim under the Computer Fraud and Abuse Act against Kris Elliott, Pam Elliott, and Brad Guitierrez, (4) a claim for replevin against all Defendants, (5) a claim for conversion against all Defendants, (6) a breach of the duty of loyalty claim against all Defendants, (7) a breach of fiduciary duty claim against Kris and Pam Elliott, (8) a tortious interference with business and contractual relationships/expectancy claim against Kris and Pam Elliott, (9) a civil conspiracy claim against all Defendants, and (10) a claim for unfair competition against all Defendants.  Along with its verified complaint, Wagner filed a motion for a temporary restraining order (Doc. 5).

Specifically, Wagner asked the Court to (1) require Defendants to return any and all documents or items belonging to Wagner that they took upon their resignations, and (2) enjoin Kris Elliott from soliciting Wagner clients pursuant to a covenant not to compete in his contract.

On January 13, 2009, the Court held a hearing on the motion for temporary restraining order (Doc. 26). That day, the Court entered a "preliminary temporary restraining order" granting in part Plaintiffs' motion (Doc. 27). Therein, the Court noted that a more detailed order would follow as soon as practicable. On January 15, 2009, the Court entered a more detailed TRO requiring the Defendants to return all files and items belonging to Wagner that were taken from the office upon their departure (Doc. 32). However, the Court denied temporary injunctive relief as to the covenant not to compete, as Kris Elliott and Wagner agreed that certain modifications had been made to the contract, despite the fact that the contract required that any modification be by signed writing only. Elliott claimed that such modifications constituted a breach of his contract, such that the covenant not to compete was no longer enforceable. Given the lack of clarity and available evidence regarding this issue, the Court declined to enjoin Kris Elliott from soliciting Wagner clients, preferring instead to let the parties conduct accelerated discovery and develop the issue more thoroughly at the preliminary injunction stage.

On February 2–4, 2009, the Court held a hearing on Wagner's motion for a preliminary injunction (Doc. 37). Having fully considered the live testimony of all witnesses, as well as all of the evidence provided by the parties, the Court hereby **GRANTS** Wagner's motion for preliminary injunction, subject to the terms and conditions provided below. However, because time is of the essence, and that the parties have provided the Court with thousands of documents for consideration, a subsequent order that provides a more detailed explanation of the Court's findings

of fact, including citations to the record, will follow.

## B.  Factual Background

Wagner is in the business of supplying photography services to local schools, including services related to the production of yearbooks.  In March 1994, Wagner purchased all of the assets of the Elliotts' school photography business, in what was known as the "Elliott Territory." On March 1, 1994, Kris Elliott entered into an employment agreement with Wagner (Doc. 5, Exh. A).  That agreement contained a covenant not to compete, which provides that Elliott cannot

> directly or indirectly, (for or on behalf of himself or any other person or entity) for a period of 18 months for the date of termination of this Agreement:
> A.  Solicit or sell school photography accounts which were accounts in the Elliott Territory or were accounts produced by Elliott during the term of this Agreement;
> B.  Disclose the list of the above-described school photography accounts or any part thereof, to anyone without the prior written consent of Employer;
> C.  Otherwise engage in competition in any respect, with Employer for any of the above-described school photography accounts.

(Doc. 5, Exh. A, ¶ 5).  The contract provides that the Elliott Territory includes the Illinois counties of Adams, Calhoun, Macoupin, Madison, Morgan, Pike, and St. Clair, excluding 21 specifically identified schools.  The territory also includes 16 specifically identified schools in Missouri (Doc. 2, Exh. A, Schedules 2 & 3).  The contract also included a provision that it "may not be amended or modified unless such modification or amendment shall be in writing and signed by all parties."

Kris's contract provided that he would be paid an annual salary of $40,000, supplemented by a bonus consisting of "twenty percent (20%) of the gross margin earned for all school photography accounts in the Elliott Territory and all new school photography accounts produced by [Kris Elliott]" (Doc. 2, Exh. A).  This arrangement worked until approximately 2001,

when Wagner no longer paid Elliott a bonus for yearbook sales. Then, in 2004, a new pay system was employed, whereby Elliott's bonus decreased, though Wagner's weekly payments to him increased. Elliott claims that he received no consideration for either of these changes and only acquiesced to them because he felt intimidated by the company's owner, Hal Wagner, and felt that his job would be in danger if he did not go along with the changes. Hal Wagner, on the other hand, testified that each change was accompanied by an increase in Elliott's base salary. Elliott claims that the "increased salary" was in fact his $40,000 salary, as provided for in his 1994 contract, supplemented by weekly advances on his year-end bonus.

Starting in 1994, Kris Elliott served as the General Manager of Wagner's business in Central and Southern Illinois from an office located in Edwardsville, IL. Pam Elliott, Kris's wife, was employed as the office manager and reported to Kris. All other Defendants worked in various capacities under the Elliotts' direction. On December 31, 2008, all Defendants submitted letters of resignation without notice, effective on January 1, 2009, leaving only two employees in the Edwardsville office. The Elliotts and Sharon Vansaghi each took jobs with Wagner's competitor, Herff Jones.

Upon receipt of the resignations, Wagner's vice-president inspected the Edwardsville office and determined that a large number of business documents were missing. These included customer lists, pending contracts, photography schedules, over 100 production orders, notebooks containing notes about customer needs, and entire customer files. Additionally, electronic files, including photographic images from each school serviced by the Edwardsville office, appeared to have been recently deleted. In addition, seven senior wall composites printed by Wagner were missing. Wagner reported other documents and items as missing and listed them in detail in the

complaint. Wagner claims that these files and items are critical to its business, such that the office cannot function without them.

Actions taken by the Elliotts on their final days of employment raised Wagner's suspicions that they and the other employees who abruptly resigned were responsible for taking these items. Wagner analyzed its Printer Job Log from its corporate headquarters in St. Louis, Missouri and determined that Pam Elliott (as user "pelliott") spent December 30, 2008 printing 110 production orders (Doc. 2, Exh. J). Wagner claimed that it was no longer able to gain access to any of these production orders electronically. Pam Elliott and other defendants also printed a variety of other business documents between December 9 and December 31 that could not be located on the computers in the Edwardsville office upon their resignation. Wagner then hired a company specializing in electronic data retrieval and was able to obtain copies of some, but not all, of the files.

Wagner soon learned that prior to their resignations, Kris and Pam Elliott sent "Publisher CDs" to certain schools. These CDs contain all of the high resolution photographs taken by Wagner at those schools, which are necessary to publish yearbooks. For instance, Greenfield Elementary received a CD accompanied by a letter informing it that the CDs would be used to print their yearbook. The letter was dated December 30, 2008 (the day before Defendants resigned), and the identified sender was "Wagner Portrait Group" (Doc. 2, Exhs. K & L). On January 2, 2009, Defendants Kris and Pam Elliott sent a solicitation letter to Greenfield Elementary on Herff Jones letterhead (Doc. 2, Exh. M). The letter announces the Defendants' change in employment and solicits the school's business. Wagner also alleges that on January 8, 2009, one of the Defendants contacted the school and stated that they were coming to pick up the "Publisher CD" so as to begin

work on the yearbook (presumably converting the Wagner client into a Herff Jones customer). Wagner has since learned that the Elliotts followed the same course of conduct at other schools.

Wagner also had trouble even determining which schools it had existing contracts with due to the lack of documentation remaining in the Edwardsville office. Additionally, it learned that Pam Elliott had solicited some of Wagner's clients in early January and convinced 21 such schools to sign contracts with Herff Jones. In fact, her signature is present on each of these contracts as a representative of Herff Jones. The time-periods involved in these contracts overlap with terms for which the schools already have contracts with Wagner. The Elliotts admit that Pam visited these schools and signed these contracts rather than Kris in an attempt to ensure that he did not personally violate his covenant not to compete with Wagner.

In accordance with the terms of the TRO previously entered by this Court, the Defendants have returned a large number of documents and items that were in their possession. Additionally, the Defendants returned one of the missing senior class composites, but stated that the other six had been delivered to the appropriate schools. Finally, by directly contacting the schools in the Elliott territory on its own, Wagner was able to obtain copies of many of its existing contracts, copies of which were not located in the office.

Wagner seeks a preliminary injunction ordering Kris and Pam Elliott, and anyone acting in concert with them, from soliciting Wagner accounts in the Elliott Territory or engaging in competition with Wagner as required by the terms of the covenant not to compete. Additionally, Wagner seeks a standing order requiring the return of all missing documents and items that may still be in the control of Defendants.

<u>**C.  Analysis**</u>

<u>**1.  General Standards Governing Preliminary Injunctions**</u>

In order to obtain a preliminary injunction, the movant must make an initial showing that (1) its case has a likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) it will suffer irreparable harm if injunctive relief is not granted.  ***See, e.g., Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1054-55 (7th Cir. 2004).**  If the movant meets its burden on these three requirements, then the Court considers two additional criteria: (4) whether the harm to the plaintiff if the injunction is wrongly denied outweighs the harm to the defendant if the injunction is wrongly granted, and (5) the public interest.  ***Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).**

The Court is faced with two generic issues here.  The first issue is whether the Court should require Defendants to return any items from the Edwardsville office that remain in their possession.  The second issue is whether Kris and Pam Elliott, and anyone acting in concert with them, should be enjoined from competing against Wagner with respect to those schools and counties identified in the covenant not to compete.

<u>**2.  Missing Documents and Items**</u>

Wagner first seeks a standard order requiring the return of its documents and office items.  As noted above, the Defendants have in fact returned many documents and items that were taken from the office.  However, Wagner's concern is that more Wagner property may remain in some Defendants' possession, whether they are currently aware of it or not.  As such, Wagner seeks that this Court enter a preliminary injunction requiring the Defendants to return any Wagner property they still possess.

The Court's analysis with respect to the missing documents and items remains virtually unchanged, as the evidence offered at the preliminary injunction hearing supported Wagner's general claim that the Elliotts took Wagner property, including copies of vital business documents, with them upon their resignations. The Elliotts do not deny that they took some of the items at issue, though Pam Elliott stated that she inadvertently took certain documents, including a Rolodex with many of Wagner's business contacts in it. Indeed, the Elliotts appear to have made a good faith effort to return all Wagner property. However, the evidence before the Court does indicate that Wagner has met the requirements for the issuance of a preliminary injunction as to any documents or items taken from the Edwardsville office that remain in the Defendants' possession.

As a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. *Bevolo v. Carter*, **447 F.3d 979, 982 (7th Cir. 2006) (citing** *Colip v. Clare*, **26 F.3d 712, 714 (7th Cir. 1994)).** As such, the Court applies Illinois's choice-of-law rules to determine the applicable substantive law. *See Hinc v. Lime-O-Sol Company*, **382 F.3d 716, 719 (7th Cir. 2004);** *Kohler v. Leslie Hindman, Inc.*, **80 F.3d 1181, 1184 (7th Cir. 1996)**. Illinois follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS in making such decisions. *Midwest Grain Products of Illinois, Inc. v. Productization, Inc.*, **228 F.3d 784, 787 (7th Cir. 2000)**.

In determining which state's law applies to Wagner's tort claims, the Court "select[s] the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties." *Carris v. Marriott International Inc.*, **466 F.3d 558, 560 (7th Cir. 2006) (citing** *Esser v. McIntyre*, **661 N.E.2d 1138, 1141 (Ill. 1996)).** The law of the place where the injury occurred is presumed to apply unless another state has a more significant relationship to

the occurrence or parties.  ***Id.***; ***Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999).**

Here, the injury occurred in Illinois, as Edwardsville, Illinois is the site of the Defendants' sudden

resignations, and is the location from which the documents and property were allegedly taken.  Also,

most if not all of the clients in the Elliott territory are located in Illinois.  Accordingly, the Court

applies Illinois law to Wagner's tort claims.

### a.  Likelihood of Success on the Merits

Wagner argues that it has a likelihood of success on its tort claims, and specifically,

its claim that Elliott breached his fiduciary duties.  Wagner argues that fiduciary duties arise out of

Kris Elliott's position as a general manager of the Edwardsville office and Pam Elliott's position as

office manager.  Indeed, it is clear that Kris Elliott managed all of Wagner's clients throughout

Central and Southern Illinois and had substantial discretion in how to conduct business with each

of them.   Additionally, Pam Elliott was the office manager who primarily assisted Kris Elliott in

his duties, including contacting clients and scheduling photography services.  "[A]gents owe

fiduciary duties of loyalty to their principals not to (1) actively exploit their positions within the

corporation for their own personal benefits; or (2) hinder the ability of the corporation to conduct

the business for which it was developed."  ***FoodComm Intern. v. Barry*, 328 F.3d 300, 303 (7th**

**Cir. 2003) (applying Illinois law).**

The threshold for showing that the movants have a likelihood of success on the merits

is low, and plaintiffs "need only demonstrate a better than negligible chance of succeeding."

***Cooper*, 196 F.3d at 813.**  The evidence presented at the preliminary injunction hearing indicates

that Wagner has a "better than negligible chance of succeeding " on this claim.  ***Cooper*, 196 F.3d**

**at 813.**  Various critical documents, client contracts, and the Rolodex containing all contact

information for Wagner's clients in the Elliott territory were missing upon the Defendants' resignations. Many of these documents were needed to understand and perform the terms of existing contracts. After the Elliotts' resignations, many documents were inaccessible in either electronic of hard copy. Wagner has not been able to restore all of these files, and has obtained copies of quite a few contracts only by contacting the schools directly. Unfortunately, Wagner claims that some of these necessary documents remain missing. The missing documents and files, accompanied by Pam and Kris Elliott's apparent printing of documents on their last days of employment, is sufficient for a finding that Wagner's breach of fiduciary duty claim has a likelihood of success on the merits.

Furthermore, the evidence confirms that Pam Elliott has secured new contracts for Herff Jones with 21 schools that were actually under contract with Wagner at the time of her resignation. This indicates a likelihood of success on the merits as to Wagner's claim that the Defendants tortiously interfered with a business relationship and breached their fiduciary duties.

### b.  Inadequate Remedy at Law / Irreparable Harm

Next, the Court considers whether Wagner has shown that it lacks an adequate remedy at law and will suffer irreparable harm if an injunction is not issued. Wagner has no adequate remedy at law because Defendants' conduct has deprived Wagner of documents necessary to follow through with its contractual obligations. If Defendants do indeed have these files, the failure to return them immediately will likely result in Wagner's inability to perform outstanding agreements. Such a failure will damage Wagner's position in the marketplace far into the future. Monetary damages would be insufficient, as it would be almost impossible to calculate the extent of this harm. And the anticipated harm is irreparable, because client relationships may never be mended if Wagner is unable to carry out its contractual duties.

### c.  Balance of the Equities

The Court must also consider the balance of the equities.  In doing so, the Court asks whether the threatened injury to the movant outweighs the potential harm to the Defendants if the injunction is wrongfully granted.  Here, it is clear that the balance of the equities tips in favor of Wagner.  If the injunction is wrongfully denied, Wagner may be unable to fulfill its contractual agreements for the reasons explained above.  Additionally, Wagner's relationships with longtime clients may be forever damaged.  Conversely, if the injunction is wrongfully granted, Defendants will be in the same position they are in now—searching for clients for its new business.  The only files at issue belong to Wagner or else to schools that have contracts with Wagner.  As far as the Court can tell, Defendants will only suffer the inconvenience of returning items they removed from Wagner's premises upon their departure.  A preliminary injunction will merely preserve the status quo until a trial on the merits can be conducted.

### d.  The Public Interest

Finally, the public's interest clearly favors granting the preliminary injunction.  In particular, Wagner's clients have an expectation that photography and yearbook services will be performed and completed pursuant to the terms of their current contracts.  Elliott's retention of Wagner materials makes it impossible for Wagner to complete such tasks, and makes it difficult for the clients to know who the proper contact for the remainder of the year actually is.  The expeditious completion of Wagner's agreements with the many school districts it services takes priority over the Defendants' quest for new business ventures.

Consequently, the Court grants the motion for preliminary injunction insofar as Defendants are required to return any and all Wagner property, in the form of documents or other

items, that remains in their possession.

### 3.  The Covenant Not To Compete

With respect to the covenant not to compete, the Court finds that the issuance of a preliminary injunction is warranted on the evidence before it.  Wagner seeks enforcement of the explicit terms of the non-compete provision in Kris Elliott's 1994 agreement.  However, Elliott argues that the provision is unenforceable because Wagner breached the agreement in either 2001 or 2004 by altering his payment structure without executing a new written agreement.

As noted above, this Court applies Illinois's choice-of-law rules to determine the applicable substantive law.  For contracts claims, the Restatement and Illinois law respects a contract's choice-of-law clause as long as the contract is valid.  ***Kohler*, 80 F.3d at 1185.**  In this case, the parties' contract includes a choice-of-law provision that "[t]his Agreement shall be construed and enforceable under the Laws of the State of Missouri" (Doc. 2, Exh. A, ¶ 7).  Accordingly, with respect to the contract claim, the Court applies Missouri law.

### a.  Likelihood of Success on the Merits

As stated previously, the threshold for showing that the movants have a likelihood of success on the merits is low, and Plaintiffs "need only demonstrate a better than negligible chance of succeeding."  ***Cooper*, 196 F.3d at 813.**  Missouri law does not favor covenants not to compete, because they restrain trade.  ***Systematic Business Servs., Inc. v. Bratten*, 162 S.W.3d 41, 49–50 (Mo. App. Ct. 2005).**  However, the Court may uphold such agreements if the party seeking its enforcement establishes "both the necessity to protect the claimant's legitimate interests and that the agreement is reasonable as to time and space."  ***Systematic Business Servs., Inc. v. Bratten*, 162 S.W.3d 41, 50 (Mo. App. Ct. 2005).**  A business's "'stock of customers' and the company's

goodwill" are considered to be legitimate interests.  *Id.* **at 49.**

In its response to the motion for preliminary injunction (Doc. 39), Elliott argues that the covenant is not reasonable as to time and space.  Specifically, he claims that many of the clients identified as being within the Elliott Territory have not conducted business with Wagner for many years.  However, Elliott has not sufficiently substantiated this allegation.  Rather, it is clear from the evidence, including the testimony of Kris and Pam Elliott themselves, that the Elliotts obtained a multitude of accounts throughout Southern Illinois, including accounts in the schools and counties identified in the covenant.  Additionally, the Court notes that the breadth of the region identified in the covenant consists of those counties and schools whom were serviced in the Elliott Territory in 1994, at which time Wagner purchased all of the Defendants' assets in that territory, including their customer accounts.  The agreement is reasonable in time and space and protects Wagner's legitimate business interests.

Elliott also argues that Wagner cannot succeed on the merits of its claim because Wagner breached the agreement in 2001 and 2004 by altering the terms of Elliott's payment structure.  As noted above, in 2001 Wagner no longer paid Elliott a bonus for yearbook sales.  Then, in 2004, a new pay system was employed, whereby Elliott's bonus decreased, though Wagner's weekly payments to him increased.  Elliott claims that he received no consideration for either of these changes and only acquiesced to them because he felt intimidated by the company's owner, Hal Wagner.  He also suggested that he felt if he did not consent, his position with the company might be terminated.  Wagner counters that each change was accompanied by an increase in Elliott's base salary.  But Elliott claims that any increase in his weekly pay stemmed from advances on his year-end bonus.

With respect to Elliott's argument that Wagner intimidated him into accepting these modifications, the Court finds Hal Wagner's testimony to be credible when considered in light of Kris Elliott's own statements. In a 2002 letter, Elliott wrote, "I believe we decided last year that the classbook sales and finishing would not be included in my numbers" (Pl. Exh. 30). Elliott's testimony clarified that the word "we" refers to Elliott and Hal Wagner. Additionally, in a 2004 letter, Elliott wrote, "Hal and I decided on a new pay system for this year" (Pl. Exh. 31). Elliott's own statements indicate that he agreed to the changes. And though Elliott claims he only agreed to this change because he was intimidated, he also admits that Hal Wagner never made any direct threats, and Elliott never made any actual objection. As a result, the Court finds that Elliott was not coerced or otherwise intimidated into accepting the contractual alterations.

As to Elliott's argument that no consideration was provided for the alleged modification, the Court again finds Hal Wagner's testimony to be credible. Hal Wagner testified that as consideration for the smaller bonus, he began paying Elliott a higher base salary. Elliott claims that the "increased salary" was in fact the $40,000 provided for in his 1994 contract, supplemented by an advance on his year-end bonus. But Elliott's own writings make it clear that he believed he received an increase in his base salary and was not being given advances. In a 2004 letter, Elliott wrote, "Hal and I decided on a new pay system for this year . . . We decided that my base salary would be $90,000" (Pl. Exh. 31). The reference to Elliott's base salary indicates that he understood that the entire $90,000 was salary—not a draw on his bonus. And Elliott's bonus in his 2002 and 2004 letters were calculated as if he earned a base salary of $66,300 in 2002 and $90,000 in 2004 (Pl. Exhs. 30 & 31). The Court also finds Hal Wagner's testimony that the change in salary

was supported by a change in market conditions to be credible.[1]

Next, the Court addresses Elliott's claim that Wagner cannot show a likelihood of success on the merits because Wagner breached the contract as early as 2001. In Missouri, an employer who breaches an employment contract may not thereafter seek enforcement of a covenant not to compete. *Ozark Appraisal Service, Inc. v. Neale*, **67 S.W.3d 759, 764 (Mo. App. Ct. 2002) (citing *Luketich v. Goedecke, Wood & Co., Inc.*, 835 S.W.2d 504, 507 (Mo. App. Ct. 1992)).**

> A party to a contract cannot seek to enforce its benefits where he is
> the first to violate its terms. "[T]he question of whether an employer
> is precluded from enforcing a covenant not to compete as a result of
> its own breach is 'largely an issue of fact for the trial court.'"

*Id.* **(quoting *Ballesteros v. Johnson*, 812 S.W.2d 217, 222 (Mo. App. Ct. 1991) (in turn, quoting *Adrian N. Baker & Co. v. DeMartino*, 733 S.W.2d 14, 17 (Mo. App. Ct. 1987))).** *See also Forms Mfg., Inc. v. Edwards*, **705 S.W.2d 67, 69 (Mo. App. Ct. 1985) ("[a] party to a contract cannot claim its benefits where he is the first to violate it.").**

The Court has already determined that, from the evidence currently before it, Wagner and Elliott mutually agreed to the changes in his pay structure. Specifically, Elliott accepted a higher annual salary in exchange for a reduction of his year-end bonus. As a result, Elliott's breach of contract argument relies upon the contract's provision that it "may not be amended or modified unless such modification or amendment shall be in writing and signed by all parties" (Doc. 2-2, Exh. A, p. 5). In other words, the Court must determine whether the mutually agreed-upon modifications to Elliott's contract constitute a breach by Wagner, simply because they were not formalized in a

---

[1] Testimony indicated that in the 1990s, a move to widely available digital photography and ease of processing at drug stores caused a decline in Wagner's business and the industry generally.

signed writing.

In support of his position, Elliott cites ***Supermarket Merchandising & Supply, Inc.
v. Marschuetz*, 196 S.W.3d 581 (Mo. App. Ct. 2006).**  There, the employer was a nation-wide
distributor of grocery store fixtures and display racks.  Defendant served a regional sales manager
and received commissions for customer sales.  His contract included a non-compete clause
prohibiting him from working in the industry for two years and prohibiting him from soliciting
plaintiff's customers for five years.  It also provided that no modifications to the agreement were
permitted unless made by a signed writing.  During the defendant's employment, however, the
employer unilaterally made changes to his contract such that defendant did not receive commissions
until customers paid their invoices in full, essentially "shift[ing] the risk of customer non-payment"
to the employee.  ***Id.* at 583–84.**  The changes also provided that where an employee left the
company, he would only receive commissions for those amounts that customers had already paid
toward their invoices as of the employee's last day.  The defendant vehemently objected to these
changes and refused to sign new agreements, though he did sign acknowledgments that he was
aware of the policy change.  Defendant continued to work for nearly 2 years under the first policy
change, and approximately 10 months after the policy change regarding commissions upon
termination.  After he tendered his resignation, he began working for a competitor and allegedly took
his former employer's biggest client with him.  The employer sought an injunction to enforce the
non-compete clause.  ***Id.* at 584.**  On appeal, the court found that the unilateral changes to the
defendant's contract were material breaches of the agreement because they affected the manner and
amount the employee was paid.  ***Id.* at 586.**

The employer argued that the defendant had ratified the changes by continuing to

work and accept paychecks under the new policies, such that he should be estopped from claiming

that there was a breach. The Court rejected the argument, explaining:

> as a general rule "[a]n employee cannot repudiate the unfavorable
> terms of [a] modified contract when he has claimed the benefits of
> continued employment under it." *Forms Mfg., Inc.*, 705 S.W.2d at
> 70. However, the burden is on the employer to prove that the
> employee waived the employer's breach of contract. *Id.* In *Forms
> Mfg.*, this Court held that an employee did not waive his employer's
> prior breach of their employment contract by continuing to work for
> an additional six months after the breach first occurred. *Id.* This
> Court noted that the employee "voiced opposition" to his employer's
> unilateral change, and was not charged with waiver because he
> initially attempted to persuade his employer to change the policy at
> issue. *Id.* In addition, this Court noted that employee's attempts to
> change the policy proved futile, and employee reasonably used the
> remainder of the six months to secure new employment. *Id.*

**Supermarket Merchandising**, 196 S.W.3d at 587.

Here, Wagner is unable to provide written agreements signed by both parties

modifying Elliott's pay structure. Thus, it is uncontested that the parties did not comply with the

contractual requirements for modifying the terms of the agreement. Though it appears Wagner may

have breached the contract in this respect, however, Wagner has carried its burden of proving that

Kris Elliott waived any breach. In any event, it is inequitable to permit Elliott to accept the

contractual clauses beneficial to him while rejecting the adverse ones.

Unlike the defendants in **Supermarket Merchandising** and **Forms Mfg.**, Elliott

admits that he did not voice an objection to the modifications. In fact, he submitted letters to

Wagner's accountants in which he stated that he and Hal Wagner had actually agreed upon changes

to his salary. *See* **Pl. Exh. 30 (stating in 2002 that "we decided last year that the classbook sales

and finishing would not be included in my numbers."); Pl. Exh. 31 (stating in 2004 that "Hal

and I decided on a new pay system for this year.").** The Court finds Hal Wagner's version of

events credible in light of Elliott's statements and actions.

Additionally, Elliott obtained a significant financial benefit from the modifications, unlike the defendants in the cases he cites. Here, he received a larger salary throughout the year, though he collected a smaller bonus at the end of the year. Conversely, Wagner paid Elliott's wages up front rather than enjoying the benefits of this capital for the entire year before paying a lump sum bonus. There is an obvious benefit to Elliott and detriment to Wagner because of the time-value of money. Due to this fact, coupled with the evidence presented and Hal Wagner's credible testimony, the Court cannot find Elliott's argument that Wagner preferred to spread out the bonus to avoid paying a year-end lump sum bonus persuasive. Giving Elliott a weekly advance on his bonus would not, in and of itself, benefit Wagner.

It would be entirely inequitable, under the circumstances of this case, to permit Elliott to collect the benefit of an increased weekly salary without complaint, and then avoid the covenant not to compete by voicing an objection for the first time nearly seven years after the first modification. Accordingly, the Court finds that Elliott did waive any breach of contract that Wagner may have committed. He is therefore estopped from asserting breach of contract as a basis to block enforcement of the covenant not to compete.

Consequently, the Court finds that Wagner has shown that its case has a "better than negligible chance of succeeding."

### b.  Inadequate Remedy at Law / Irreparable Harm

Next, the Court considers whether Wagner has shown that it lacks an adequate remedy at law and will suffer irreparable harm if the covenant is not enforced. Wagner has no adequate remedy at law because solicitation of its clients in contravention of the covenant could

deprive Wagner of its stock of customers, of which Elliott has intimate knowledge. Additionally, there is evidence that the solicitation of Wagner clients has already caused a great deal of confusion among the schools with whom Wagner does business. There is also evidence that the Elliotts may have interfered with Wagner's existing contracts by securing contracts for Herff Jones for semesters during which certain schools already have written agreements with Wagner.

Monetary damages would be insufficient, as it would be almost impossible to calculate the extent of this harm. And the anticipated harm is irreparable, because damage to client relationships and Wagner's goodwill may never be mended if the covenant is not enforced. Finally, Wagner would be deprived of the benefit of the bargain it entered into with Kris Elliott in 1994, when Wagner purchased all of the assets of Elliott's photography business, including the Elliott Territory.

### c. The Balance of the Equities

Next, the Court must consider the balance of the equities. In doing so, the Court asks whether the threatened injury to the movant outweighs the potential harm to Elliott if the injunction is wrongfully granted. Here, it is clear that the balance of the equities tips in favor of Wagner. If the injunction is wrongfully denied, Wagner may lose countless contracts with existing clients, now and in the near future. Additionally, Wagner's relationships with longtime clients may be forever damaged. Conversely, if the injunction is wrongfully denied, Elliott will still be permitted to solicit clients for Herff Jones so long as they are not located in the prohibited territory. Moreover, Elliott has indicated that he is paid a full yearly salary from Herff Jones in the amount of $75,000 which does not include any bonuses that he may receive, and he has not provided an indication as to what extent a wrongfully entered injunction might damage him economically. In any case, monetary

harm can easily be quantified if the injunction is later determined to be improper.

### d.  The Public Interest

Finally, the public's interest clearly favors granting the preliminary injunction.  As noted above, there has been considerable evidence that a number of schools have indicated their confusion with respect to the solicitations already undertaken by the Elliotts.  It is difficult for the clients to know who the proper contact for the remainder of the year actually is, and the Elliotts' new agreements with schools who are currently under contract with Wagner may in fact result in a breach of contract by these schools.  It is in the public's interest that the schools not be placed on such precarious footing.

### e.  The Scope of the Covenant not to Compete

The Court notes that Wagner seeks the enforcement of the covenant not to compete as to both Kris and Pam Elliott, even though only Kris Elliott has a covenant not to compete in his contract.  The basis of this request is that in their new employment setting with Herff Jones, Kris Elliott is Pam Elliott's boss.  Accordingly, her actions with respect to the solicitation of any clients is done at the direction of Kris Elliott.  Indeed, Pam Elliott testified that Kris Elliott sent her to Wagner schools, specifically out of concern that his personal involvement with such schools might violate the covenant not compete.  In doing so, Pam Elliott was able to obtain 21 written contracts from schools that currently have contracts with Wagner—and the contractual time-periods involved in many of these new contracts overlap with those in Wagner's contracts.

The covenant not to compete provides that Kris Elliot

> will not, **directly or indirectly, (for or on behalf of himself or any other person or entity**) for a period of 18 months for the date of termination of this Agreement:
> A.  Solicit or sell school photography accounts which were accounts

in the Elliott Territory or were accounts produced by Elliott during the term of this Agreement;
B.  Disclose the list of the above-described school photography accounts or any part thereof, to anyone without the prior written consent of Employer;
C.  Otherwise engage in competition in any respect, with Employer for any of the above-described school photography accounts.

**Doc. 2, Exh. A, ¶ 5 (emphasis added).**  Because Pam Elliott is acting under Kris Elliott's direction, her solicitation of school photography accounts in the Elliott Territory is imputed to Kris Elliott. In other words, such conduct constitutes indirect solicitation and competition for clients in the prohibited region by Kris Elliott.[2]  Accordingly, she must be enjoined from violating the covenant not to compete on Kris Elliott's behalf.

Consequently, the Court grants the motion for preliminary injunction insofar as Kris and Pam Elliott, and anyone acting in active concert or participation with them, are enjoined from soliciting or competing for school photography accounts in the Elliott Territory, as provided by the covenant not to compete in Kris Elliott's contract with Wagner.

## 4.  The Bond Requirement

FEDERAL RULE OF CIVIL PROCEDURE 65(c) provides:

The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that

---

[2]  In fact, when issuing the TRO in this case, the Court specifically highlighted this issue. The Court explained:

However, the Court does caution Kris Elliott that should he or anyone acting on his behalf proceed with any such solicitations in the interim, Elliott is at risk of breaching the covenant not to compete in the event that the Court eventually finds it enforceable. As a result, Kris Elliott and his agents act at their own peril with regard to any solicitation of the schools included in the covenant not to compete.

**Doc. 32, p. 9.**

> the court considers proper to pay the costs and damages sustained by
> any party found to have been wrongfully enjoined or restrained.

The literal reading of Rule 65(c) provides that security is mandatory, and the Seventh Circuit has generally required that security be given. ***See Minnesota Power & Light Co. v. Hockett*, 14 Fed.Appx. 703, 707 (7th Cir. 2001) ("Posting such a security . . . is the cost of doing business in federal court."); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 445 (7th Cir. 1990) (explaining that Rule 65(c) "makes such security mandatory, although a number of environmental decisions . . . waive the requirement or allowing the posting of a nominal bond.").**

Neither party has addressed this issue since the hearing on the TRO. In the absence of a request by the Defendants that a higher bond be required, the Court sees no reason to alter the bond in this case. This is especially so, in light of testimony indicating that Kris Elliott is a salaried employee at Herff Jones, and the lack of any testimony indicating the extent to which enforcement of the covenant not to compete will affect his income. Accordingly, the Court requires Wagner to post security in the amount of $500.

### D.  Terms of the Injunction

Having fully considered the parties' allegations, pleadings, and arguments, and based upon the foregoing findings, the Court **ORDERS** as follows:

(1) A preliminary injunction is issued immediately. Wagner shall post security in the amount of **$500.** The Court notes that Wagner already posted the required security when the TRO was initially entered (Doc. 31).

(2)  Defendant Kris Elliott, and anyone acting in active concert or participation with him, specifically including, but not limited to, Defendants Pam Elliott, Brad Gutierrez, Cindy

Hargrave, Phil Walker, and Sharon Vansaghi, are compelled to return any and all property of Wagner within their possession, control, or access, including but not limited to any and all "Publication CDs" or other CDs containing any Wagner photography. Additionally, if any such items are not in Defendants' possession but any Defendant knows where they are, then the Defendant shall disclose the item's whereabouts.

(3) Defendant Kris Elliott, and anyone acting in active concert or participation with him, is enjoined from disclosing, in part or in whole, the list of school photography accounts in the Elliott Territory.

(4) Defendants Kris Elliott and Pam Elliott, and anyone acting in active concert or participation with them, are hereby enjoined from soliciting or selling school photography to any accounts or customers which were accounts in the "Elliott Territory" as defined in the Employment Agreement between Wagner and Kris Elliott. Kris and Pam Elliott and anyone acting in active concert or participation with them, are specifically enjoined from soliciting or selling school photography or otherwise engaging in competition in any manner with Wagner for any school photography business within:

(A) the Illinois counties of Adams, Calhoun, Macoupin, Madison, Morgan, Pike, and St. Clair;

(B) the following schools in the State of Missouri: Becky David Elementary School, Buder Elementary School, Central Elementary School, Commons Lane School, Crestwood Elementary School, Fairview Elementary School, Halls Ferry School, Henderson Elementary School, Jennings Senior High School, Meramec Elementary

School, Northview Elementary School, St. Sebastian School,

Wedgwood Elementary School, Woodland Elementary School, River

Roads School, and St. Sebastian Sports League; and

(C) to the extent not otherwise covered by the geographic counties of

Adams, Calhoun, Macoupin, Madison, Morgan, Pike, and St. Clair

Counties, the specific accounts in Exhibit 1 attached hereto.

The Court cautions the Elliotts that it cannot envision a circumstance where Pam Elliott can solicit

businesses within the Elliott Territory without violating this Order.

(5) Defendant Kris Elliott, and anyone acting in active concert or participation with him,

is enjoined from using or disclosing any business information of Wagner, or using or disclosing any

copies of Wagner's documents, including, but not limited to, any and all "Publication CDs" or other

CDs containing any Wagner photography.

(6) This Order shall remain in full force and effect until a full trial on the merits can

be held. Currently, trial in this case is set for **9:00 a.m. on February 1, 2010**. Upon proper motion

by either party, the Court will entertain advancing the trial setting to an earlier date. Because the

Court's calendar is already congested, such a motion should be filed sooner rather than later.

## E.  Conclusion

For the reasons thoroughly explained above, the Court hereby **GRANTS** Wagner's

motion for a preliminary injunction (Doc. 37).

**IT IS SO ORDERED.**

**DATED this 6th day of February 2009.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**
