**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **HAL WAGNER STUDIOS, INC., d/b/a** | ) | |
| **WAGNER PORTRAIT GROUP** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:09-CV-31-MJR** |
| | ) | |
| **KRIS ELLIOTT, PAM ELLIOTT,** | ) | |
| **BRAD GUTIERREZ, CINDY HARGRAVE,** | ) | |
| **ROBERT BRAY, PHIL WALKER and** | ) | |
| **SHARON VANSAGHI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## SUPPLEMENTING PRELIMINARY INJUNCTION

**REAGAN, District Judge:**

This Order is a detailed supplement to the Court's prior Order Issuing Preliminary Injunction (Doc. 46) and includes thorough findings of fact and conclusions of law. However, the terms of the preliminary injunction have not changed.

### A. Background and Introduction

On January 9, 2009, Plaintiff Hal Wagner Studios, Inc. (hereinafter "Wagner") filed this action against Defendants alleging ten counts (Doc. 2), including: (1) a claim for injunctive relief to enforce the non-compete agreement against Kris Elliott, (2) breach of contract claim against Kris Elliott, (3) a claim under the Computer Fraud and Abuse Act against Kris Elliott, Pam Elliott, and Brad Gutierrez, (4) a claim for replevin against all Defendants, (5) a claim for conversion against all Defendants, (6) a breach of the duty of loyalty claim against all Defendants, (7) a breach of fiduciary duty claim against Kris and Pam Elliott, (8) a tortious interference with business and contractual relationships/expectancy claim against Kris and Pam

Elliott, (9) a civil conspiracy claim against all Defendants, and (10) a claim for unfair competition against all Defendants. Along with its verified complaint, Wagner filed a motion for Temporary Restraining Order (Doc. 5). Specifically, Wagner asked the Court to (1) require Defendants to return any and all documents or items belonging to Wagner that they took upon their resignations, and (2) enjoin Kris Elliott from soliciting Wagner clients pursuant to a covenant not to compete in his contract.

On January 13, 2009, the Court held a hearing on the motion for Temporary Restraining Order (Doc. 26). That day, the Court entered a "preliminary temporary restraining order" granting in part Plaintiff's motion (Doc. 27). Therein, the Court noted that a more detailed order would follow as soon as practicable. On January 15, 2009, the Court entered a more detailed TRO requiring the Defendants to return all files and items belonging to Wagner that were taken from the office upon their departure (Doc. 32). However, the Court denied temporary injunctive relief as to the covenant not to compete, as Kris Elliott and Wagner agreed that certain modifications had been made to the contract, despite the fact that the contract required that any modification be by signed writing only. Elliott claimed that such modifications constituted a breach of his contract, such that the covenant not to compete was no longer enforceable. Given the lack of clarity and available evidence regarding this issue, the Court declined to enjoin Kris Elliott from soliciting Wagner clients, preferring instead to let the parties conduct accelerated discovery and develop the issue more thoroughly at the preliminary injunction stage.

On February 2-4, 2009, the Court held a hearing on Wagner's motion for a preliminary injunction (Doc. 37). On February 6, 2009, the Court entered its Order Issuing Preliminary Injunction (Doc. 46) and indicating therein that a subsequent Order would follow providing a more detailed explanation of the Court's findings of fact and conclusions of law, including

citations to the record.  Accordingly, the Court now issues its supplement to the preliminary injunction Order, including its fact and conclusions of law.

## B.  Findings of Fact

### Wagner's Acquisition of the Elliott Territory, the Execution of an Employment Agreement with Kris Elliott, and the Compensation History Between Wagner and Elliott

1. The testimony of Wagner witnesses, Hal Wagner and Penny Wagner, shows that Wagner is in the business of supplying photography services to local schools, including services related to the taking of student photographs in the Spring and Fall seasons and the production of yearbooks for Wagner's school accounts toward the conclusion of each academic year.

2. As reflected by the testimony of Hal Wagner and Kris Elliott, in March 1994, Wagner entered into an Asset Purchase Agreement with Delmar Studios to purchase substantially all of the assets and properties used in the school photography business then known as the "Elliott Territory."  (Plaintiff's Exhibit 24).

3. As reflected in the Asset Purchase Agreement, Delmar Studios acquired from Kris Elliott substantially all of the assets and properties, both tangible and intangible, then used in the school photography business of Kris Elliott, in partial consideration of certain past due finishing charges owed by Kris Elliott to Delmar Studios.  (Plaintiff's Exhibit 24).

4. As testified to by Kris Elliott and Hal Wagner, as part of a global transaction in March 1994, Delmar Studios contemporaneously conveyed to Wagner substantially all of the assets and properties used in conducting the photography business of Kris Elliott with Delmar Studios and Wagner employed Kris Elliott to manage the Elliott Territory on behalf of Wagner from the same office in Edwardsville, Illinois used by Kris Elliott to manage the Elliott Territory on behalf of Delmar Studios prior to such acquisition.  (Plaintiff's Exhibits 26, 27, & 28).

5.     Wagner paid the sum of $245,000.00 to acquire the photography business known as the Elliott Territory.  The assets and business acquired by Wagner specifically included: (a) all photographic equipment and supplies used in the business of Kris Elliott; (b) all of the records relating to such photography business of Elliott; (c) the executory contracts and agreements, including, without limitation, school photography contracts, orders and agreements obtained by Kris Elliott from schools in the Elliott Territory; and (d) all of the customer relations and goodwill associated with the Elliott Territory and Elliott's photography business as a going concern. (Plaintiff's Exhibit 24, Asset Purchase Agreement, p. 2).

6.     By letters dated February 15, 1994 and February 21, 1994, proposals on the terms of employment of Kris Elliott by Wagner were exchanged.  (Plaintiff's Exhibits 26 & 27).

7.     In his letter dated February 21, 1994 to Hal Wagner, Kris Elliott objected to the inclusion of a non-compete covenant in his employment agreement with Wagner "in light of the fact that I will be signing a non-compete clause with Delmar Studios, and that contract will be assigned to you."  (Plaintiff's Exhibit 27, p. 2).

8.     As testified to by Hal Wagner, Wagner insisted upon a covenant not to compete to protect the photography business and assets acquired by payment of $245,000.00, and a covenant not to compete was contained in the final Employment Agreement entered into between Kris Elliott and Wagner in March 1994.  (Plaintiff's Exhibit 28, p. 3, ¶ 5).

9.     The Employment Agreement (hereinafter "Employment Agreement" or "contract") between Kris Elliott and Wagner provides that Elliott cannot:

> Directly or indirectly, (for or on behalf of himself or any other person or entity) for a period of 18 months for (sic) the date of termination of this Agreement;
> A.  Solicit or sell school photography accounts which were accounts in the Elliott Territory or were accounts produced by Elliott during the term of this Agreement;

> B. Disclose the list of the above-described school photography accounts or any part thereof, to anyone without the prior written consent of Employer;
>
> C. Otherwise engage in competition in any respect, with Employer for any of the above-described school photography accounts.

(Doc. 5, Exhibit A, ¶ 5; Plaintiff's Exhibit 28, p. 3, ¶ 5).

10.    The contract provides that the Elliott Territory includes the Illinois counties of Adams, Calhoun, Macoupin, Madison, Morgan, Pike, and St. Clair, excluding 21 specifically identified schools. The Elliott Territory also includes 16 specifically identified schools in Missouri. (Plaintiff's Exhibit 28, Schedules 2 & 3 and Plaintiff's Exhibit 29 (Doc. 18), Schedules 2 & 3).

11.    The contract also includes a provision that it "may not be amended or modified unless such modification or amendment shall be in writing and signed by all parties." (Plaintiff's Exhibit 28, p.s 4-5, ¶ 9).

12.    Kris Elliott's contract with Wagner provided that he would be paid an annual salary of $40,000.00. (Plaintiff's Exhibit 28, p. 2, ¶ 2A).

13.    Kris Elliott's contract with Wagner provided that, in addition to the annual salary compensation, Elliott would be paid as "Additional Financial Incentive" 20% of the Gross Margin earned for all school photography accounts in the Elliott Territory and all new school photography accounts produced by Kris Elliott. (Plaintiff's Exhibit 28, p. 2, ¶ D).

14.    The contract between Kris Elliott and Wagner provided specifically that Kris Elliott "will be entitled to this Additional Financial Incentive to the extent it exceeds the total compensation paid to Employee (Kris Elliott) as set forth in ¶ 2 ("Salary") above." (Plaintiff's Exhibit 28, pp. 2-3, ¶ 2D).

15.     As reflected by the testimony of Kris Elliott and Hal Wagner and documents introduced and admitted into evidence, the compensation structure between Kris Elliott and Wagner varied from the express terms of the Employment Agreement during the course of their business and employment relationship from March 1994 through Kris Elliott's resignation of employment without notice on December 31, 2008.  For example, in 2000, Kris Elliott was paid an annual salary of $66,300.00.  (Plaintiff Exhibit 55, p. 5).

16.     In 2003, Kris Elliott's annual salary was increased to $90,000.00.   (Plaintiff's Exhibit 55, p. 11; Plaintiff's Exhibit 31).

17.     As reflected by the testimony of both Hal Wagner and Kris Elliott, the annual salary of Kris Elliott was increased from $90,000.00 to $92,000.00 following a discussion between Hal Wagner and Kris Elliott in July of 2005.  (Plaintiff's Exhibit 33).

18.     The testimony was undisputed that none of the salary increase changes from $40,000.00 per year to $92,000.00 per year were reflected by a formal amendment or modification to the Employment Agreement between Kris Elliott and Wagner.

19.     Throughout the course of Kris Elliott's employment of nearly 15 years with Wagner, the bonus structure between Kris Elliott and Wagner was also modified.  For example, in September 2001, the class book (yearbook) sales and finishing numbers ceased to be included in the bonus calculation figures for Kris Elliott's bonus.  (Plaintiff's Exhibit 30).

20.     For the bonus amount to be paid to Kris Elliott following Wagner's fiscal year ending June 30, 2004, the bonus or "Additional Financial Incentive" was calculated based upon a 20%, 10%, and 7.5% calculation of net sales, depending upon the volume of net sales.  (Plaintiff's Exhibit 31).

21.     In July of 2005, Hal Wagner and Kris Elliott discussed an overall compensation structure that remained in effect through December 31, 2008, on the following terms:  Kris Elliott's salary was increased from $90,000.00 to $92,000.00 per year; Kris Elliott's bonus to be paid in 2005 was the same as the bonus paid the prior year; Kris Elliott's monthly gas or automobile allowance increased from $150.00 per month to $350.00 per month; and Kris Elliott would not be guaranteed a bonus thereafter.  (Plaintiff's Exhibit 33).

22.     Kris Elliott and Hal Wagner also discussed in July of 2005 that Wagner would hire a new salesperson to work in the Elliott Territory as part of the overall discussion on the restructuring of Kris Elliott's compensation thereafter.  (Plaintiff's Exhibit 33).

23.     Based upon the course and conduct of their dealings over a number of years, the changes to the bonus compensation structure for Kris Elliott were not reduced to writing in a formalized modification or amendment to the Employment Agreement, much like the increases to Kris Elliott's salary from $40,000.00 per year in 1994 to $92,000.00 in 2005 were not subject to any formalized modification or amendment to the Employment Agreement between Kris Elliott and Wagner.

24.     This Court finds specifically that any changes to the compensation terms between Wagner and Kris Elliott over a period of nearly 15 years were agreed to by and between Kris Elliott and Hal Wagner and Hal Wagner's testimony to that effect is credible and credited by this Court.

25.     Kris Elliott testified that he agreed to the overall compensation changes discussed by him with Hal Wagner in July 2005, although he testified that he felt compelled to do so. However, this Court finds that Kris Elliott was not forced to accept any changes to his compensation terms during his nearly 15 year employment with Wagner as the manager of

Wagner's photography business known as the Elliott Territory. Hal Wagner and Kris Elliott both testified that Kris Elliott was never threatened with employment loss throughout his entire period of employment with Wagner and that Kris Elliott never raised any complaints regarding his method of compensation after any discussions were had between Hal Wagner and Kris Elliott regarding the manner in which Kris Elliott would be compensated by Wagner.

26. In fact, Kris Elliott, on multiple occasions, documented his voluntary agreement and mutual decision with Hal Wagner regarding the compensation structure between Elliott and Wagner over the substantial number of years for which Elliott was employed by Wagner to manage Wagner's Elliott Territory from Wagner's office in Edwardsville, Illinois. On September 10, 2002, Kris Elliott prepared a letter to Hal Wagner in which he stated, "I believe we decided last year that the class book sales and finishing would not be included in my numbers." (Plaintiff's Exhibit 30).

27. On September 1, 2004, Kris Elliott prepared another letter to Wagner's accountant (Dan Lawrence) stating:

> "Here are the year end numbers that I came up with, please check against your records. **Hal and I decided** on a new pay system for this year. It is as follows: **We decided** that my base salary would be $90,000.00. If any other money is owed, it would be calculated as a percentage of the net sales. Up to $90,000.00, the percent is 20%, from $90,001.00 to $100,000.00, the percent is 10%, and from $100,001.00 on, the percent is 7.5%. Net sales does not include any yearbook sales or costs."

(Plaintiff's Exhibit 31 (emphasis added)).

28. This Court also finds, contrary to the testimony of Kris Elliott, that all salary payments made to Kris Elliott by Wagner from March 1994 through December 2008 were, in fact, payments of salary and not payments in the form of "draws against commissions." In so finding, this Court relies upon: (a) Kris Elliott's own admission that Hal Wagner never discussed

with him payment of any draw against commissions. (Kris Elliott Depo., marked as Court Exhibit Plaintiff A, p. 163); (b) taxes were withheld from Kris Elliott's bi-weekly salary payments in the ordinary course of issuing payroll checks, as testified to by Kris Elliott and Leslie Elgert on behalf of Wagner and reflected in Plaintiff's Exhibit 55; (c) Kris Elliott's own written statements of "This does not include my normal salary" and "We decided that my base salary would be $90,000.00" (Plaintiff's Exhibits 30 and 31); and (d) the unambiguous language in the Employment Agreement which provides for separate compensation components of an annual Salary and an Additional Financial Incentive or bonus. (Plaintiff's Exhibit 28).

29.     As attested to by Kris Elliott and Hal Wagner, from March of 1994 until the end of December 2008, Wagner paid Kris Elliott approximately $1,250,000.00 in total compensation. (Plaintiff's Exhibit 55).

### The Defendants' Employment with Wagner

30.     Kris Elliott served as the General Manager of Wagner's business in Central and Southern Illinois as he was employed to continue handling the photography business of the Elliott Territory as an employee of Wagner after Wagner acquired the Elliott Territory from Delmar Studios for $245,000.00. (Kris Elliott Depo., p. 19, 22).

31.     As noted above, when Kris Elliott started to work for Wagner as its General Manager in Edwardsville, Illinois, the Kris Elliott territory consisted of Adams, Calhoun, Macoupin, Madison, Morgan and St. Clair Counties in Illinois, excluding certain specific accounts on Schedule 2 of the Employment Agreement. (Plaintiff's Exhibits 28 and 29).

32.     Collinsville High School, one of the accounts excluded on Schedule 2 of the Employment Agreement, became part of the Elliott Territory during his employment with Wagner. (Kris Elliott Depo., pp. 38-39).

33.     Kris Elliott remained in charge of the Wagner Edwardsville office from March 1994 until his resignation without notice on December 31, 2008. (Kris Elliott Depo., p. 40).

34.     Defendant Pam Elliott worked in the office of Delmar Studios with her husband, Kris Elliott, from 1987 until March of 1994. (Pam Elliott Depo., marked as Plaintiff's Exhibit B, p. 14).

35.     In March of 1994, Pam Elliott started working for Wagner in the same capacity and office where she previously worked with her husband on behalf of Delmar Studios. (Pam Elliott Depo., pp. 15-16).

36.     As reflected by the testimony, throughout their employment with Wagner, Defendants Brad Gutierrez, Cindy Hargrave, Robert Bray, and Phil Walker worked under the direction and control of the Elliotts in Wagner's Edwardsville office.

37.     Throughout her employment with Wagner, Defendant Sharon Vansaghi worked out of Wagner's Marion, Illinois office. (Kris Elliott Depo., p. 203-04).

**Defendants' Resignations and Employment by Competitor Herff Jones**

38.     On December 31, 2008, all Defendants mailed letters of employment resignation without notice to Wagner's corporate office in St. Louis, Missouri. (Plaintiff's Exhibits 37-46).

39.     Kris Elliott prepared the resignation letters for Pam Elliott, Phil Walker, Cindy Hargrave, and himself, which he mailed to Wagner. (Kris Elliott Depo., p. 193-96).

40.     Wagner received the notices of resignation from Defendants on Friday, January 2, 2009. (Plaintiff's Exhibits 44-46).

41.     As testified to by Wagner's Vice President Penny Wagner, the Edwardsville, Illinois office of Wagner was left without any management and only two short term employees remained following the collective resignations of the Defendants.

42.     Upon resigning from Wagner, Kris Elliott and Pam Elliott commenced employment immediately with Herff Jones, Inc. (hereinafter "Herff Jones"), a direct competitor of Wagner in the photography business.  (Plaintiff's Exhibit 61).

43.     The testimony of Kris Elliott and Sharon Vansaghi established that Defendant Vansaghi also commenced employment with Herff Jones immediately following her resignation of employment from Wagner and that Vansaghi is currently employed in a sales/office coordinator position in Marion, Illinois for Herff Jones, where she reports directly to Kris Elliott as the Territory Manager for Herff Jones.  (Kris Elliott Depo., pp. 182-183).

44.     As reflected by the Elliotts' testimony, Pam Elliott reports directly to Kris Elliott in a two person operation of a new Herff Jones territory in Central and Southern Illinois under the direction of Kris Elliott.

45.     The Central and Southern Illinois territory under the direction of Kris Elliott for Herff Jones is larger in geographic scope than the Elliott Territory managed by Kris Elliott on behalf of Wagner through Wagner's Edwardsville, Illinois office, but encompasses every county contained in the non-competition agreement between Wagner and Kris Elliott.  (Kris Elliott Depo., p. 180).

46.     Kris Elliott's compensation plan with Herff Jones provides him with a guaranteed salary of $75,000.00 plus a commission of 10% of the revenue on all school contracts obtained by himself, Pam Elliott, Sharon Vansaghi, or anyone else in the new Illinois territory of which he is Territory Manager for Herff Jones, to the extent yearly gross margin of sales exceeds $75,000.00 in Mr. Elliott's new territory.  (Kris Elliott Depo., pp. 175-176, 179-188).

47.     Pam Elliott let her husband, Kris Elliott, handle the new business opportunity for both of the Elliotts at Herff Jones.  (Pam Elliott Depo., p. 151).

48. To the extent anyone recruited Pam Elliott to become employed at Herff Jones, she was recruited by her husband to join him at Herff Jones. (Pam Elliott Depo., p. 207).

49. Pam Elliott never told any current employee of Herff Jones that she was accepting an offer to work for Herff Jones and only communicated that decision to Kris Elliott when they made a joint final decision to agree to go work for Herff Jones. (Pam Elliott Depo., pp. 208-09).

50. Defendant Sharon Vansaghi learned of the opportunity to leave Wagner's employment and to become employed at Herff Jones from Kris Elliott. (Kris Elliott Depo., pp. 183-85).

51. Kris Elliott coordinated the timing of his resignation from Wagner with the timing of Sharon Vansaghi's resignation from Wagner to become employed at Herff Jones. (Kris Elliott Depo., pp. 202-03).

**Missing Wagner Property Following Resignations**

52. As reflected by the testimony of Wagner's Vice President Penny Wagner, following receipt of the resignation letters from the seven Defendants, Penny Wagner inspected the Edwardsville, Illinois office and determined that a large number of business documents were missing.

53. As reflected by the testimony of Penny Wagner, the business information and documents missing from the Edwardsville, Illinois office of Wagner included: customer lists; pending contracts; photography schedules; over 100 production orders; notebooks containing information on customer needs; customer file documents and a valuable customer rolodex known as "The Bible" at the Edwardsville office of Wagner.

54. In addition, Penny Wagner discovered that seven senior wall composites prepared by Wagner for its school accounts were missing and that several electronic files including

photographic images and Wagner business information had appeared to have been recently deleted from the computers of Pam Elliott and Kris Elliott.

55.     Penny Wagner analyzed a Job Printer Log that was available from Wagner's corporate office and determined that numerous documents had been printed by Pam Elliott on December 29, 30, and 31, 2008, including 110 production orders, customer lists and other business documents that could not be retrieved electronically from the computers used by Pam Elliott and Kris Elliott at Wagner's Edwardsville office.  (Plaintiff's Exhibit 10).

56.     Wagner hired a data recovery firm to attempt to retrieve electronic files that had been deleted from the computer used by Kris Elliott in Wagner's Edwardsville office. (Plaintiff's Exhibit 11).

57.     The data recovery firm hired by Wagner was able to retrieve some of the business information that had been deleted from the computer used by Kris Elliott, including: (a) drafts of current photography agreements and a detailed current customer list (Plaintiff's Exhibit 12; 2009); (b) yearbook cover form and a 2008-2009 yearbook deadline document to be sent to Wagner school accounts (Plaintiff's Exhibits 13 and 14); and (c) numerous current and professionally prepared bids or proposals to Wagner school accounts (Plaintiff's Exhibit 15).

**The Elliotts' Misappropriation of Wagner Photography Images**

58.     Within days of being advised of the resignations of Kris Elliott and Pam Elliott, Wagner learned that Kris and Pam Elliott had sent Wagner's "Publisher CDs" and other CDs containing Wagner photography to numerous school accounts of Wagner.  (Plaintiff's Exhibits 19, 47, 83, 84 and 85).  The testimony showed that the Publisher CDs contained all of the high resolution photographs taken by Wagner at various schools which are necessary to publish its yearbooks.

59.    For instance, Wagner customer Greenfield Elementary School was sent a CD with Wagner photography, accompanied by a letter informing it that the CDs would be used to print their yearbooks.  (Plaintiff's Exhibit 19).

60.    The letter to Greenfield Elementary School was dated December 30, 2008 (the day before the resignations of Pam and Kris Elliott).  Pam Elliott admitted that she sent such a letter with Wagner photography work on CDs to Greenfield Elementary School and to numerous other elementary school customers of Wagner on December 30, 2008.  (Plaintiff's Exhibit 19; Pam Elliott Depo., pp. 161-163, 58-65).

61.    Pam Elliott obtained CDs of Wagner photography work in December 2008 for the express purpose of sending them to Wagner's school customers just before she resigned.  (Pam Elliott Depo., p. 67).

62.    The CDs of Wagner photography work sent by Pam Elliott on December 30, 2008 contained Wagner photography work that was to be used by Wagner in printing its customer yearbooks in 2009 (Pam Elliott Depo., p. 57).

63.    It was Kris Elliott's decision to send the Publisher and other CDs with Wagner photography work to schools just before the Elliotts' resignations on December 31, 2008.  (Pam Elliott Depo., pp. 58, 160-61).

64.    None of the Wagner school accounts to whom Pam Elliott sent the CDs with Wagner Photography work, just before Pam Elliott's resignation, had asked Pam Elliott to send such CDs.  (Pam Elliott Depo., p. 60).

65.    Neither Pam Elliott nor Kris Elliott told anyone at Wagner's corporate headquarters that Pam Elliott was sending CDs with Wagner photography work to various Wagner school accounts at the end of December 2008.  (Pam Elliott Depo., pp. 60-61).

66.     As of December 2008, Wagner intended to print the yearbooks in 2009 for the schools to whom Pam Elliott sent the CDs with Wagner photography at the end of December 2008. (Pam Elliott Depo., p. 65).

67.     The CDs for the yearbooks that Wagner intended to print for elementary schools in 2009 would have stayed with Wagner in the ordinary course of Wagner's business. (Pam Elliott Depo., p. 64).

### Pam Elliott's Removal of Property and Printing of Business Documents on December 30 and 31, 2008

68.     Despite testifying that she did so inadvertently, Pam Elliott picked up a rolodex of Wagner containing valuable client business and contact information (known as "The Bible"), put the rolodex in a box, and took it with her when leaving Wagner's premises on December 31, 2008. (Plaintiff's Exhibit 9; Pam Elliott Depo., pp. 160-61, 201-02).

69.     Pam Elliott returned the rolodex known as "the Bible" to Wagner after Penny Wagner had made inquiry on January 5, 2009 of its whereabouts to Defendant Cindy Hargrave and after the solicitation letters had been sent by Pam and Kris Elliott to the Wagner school accounts on behalf of Herff Jones. (Plaintiff's Exhibits 9 and 61).

70.     Pam Elliott also removed three large senior high school composites that were being prepared by Wagner for certain high school accounts. Pam Elliott delivered two of those Wagner composites to Wagner accounts after her resignation and while working for Herff Jones, and returned a third composite (Greenfield High School Class of 2008) after the Court entered a Temporary Restraining Order on January 13, 2009. (Pam Elliott Depo., pp. 75-76; Plaintiff's Exhibit 2).

71.     On December 31, 2008, Pam Elliott removed from Wagner's office at least 90 of 110 production order forms that she printed on December 30, 2008 relating to Wagner's school

production orders in progress. Those production order documents were returned to Wagner by Pam Elliott following the Court's Temporary Restraining Order entered on January 13, 2009. (Pam Elliott Depo., pp. 38-39; Plaintiff's Exhibit 3).

72.     Following the Court's entry of a Temporary Restraining Order on January 13, 2009, Pam Elliott also returned a Wagner school customer list and a three to four inch binder containing extensive amounts of pricing and yearbook information for Wagner accounts. (Plaintiff's Exhibits 4 and 5).

73.     Following the Court's entry of a Temporary Restraining Order on January 13, 2009, Pam Elliott also returned to Wagner 30 electronic files with Wagner business information that resided on Pam Elliott's home computer. (Plaintiff's Exhibit 8).

74.     In addition, following the Court's entry of a Temporary Restraining Order on January 13, 2009, Pam Elliott returned Publisher CDs and other CDs of Wagner photography which she had sent to Damiansville, Glen Carbon, and Caseyville schools on December 30, 2008. (Plaintiff's Exhibit 6).

75.     Pam Elliott testified that she did not submit any timecard for the several hours of time she spent at Wagner's Edwardsville office on December 30 or December 31, 2008, a period that Wagner's office was closed for business over the holidays, because she knew that she had not been performing any services on behalf of Wagner during those two days immediately prior to her and Kris Elliott's resignations from Wagner. (Pam Elliott Depo., pp. 164-65, 173).

**The Herff Jones Solicitation Letter to Wagner Schools Dated January 2, 2009**

76.     By letter dated January 2, 2009 to Greenfield Elementary School, signed by both Pam Elliott and Kris Elliott, the Elliotts solicited the business of Greenfield Elementary School (an existing Wagner customer) on behalf of Herff Jones. In that one page solicitation letter

designed to get business from existing Wagner accounts on behalf of Herff Jones, Pam and Kris Elliott refer to themselves as a team, using words such as "we," "Pam and I," "our," or "us," sixteen times. (Plaintiff's Exhibit 61; Pam Elliott's Depo., p. 167).

77.　　Kris Elliott prepared all Herff Jones solicitation letters sent out immediately after the Elliotts' resignations and directed Pam Elliott to sign various solicitation letters and to return them to him. (Pam Elliott Depo., pp. 167-168).

78.　　The Elliotts' January 2, 2009 solicitation letter on behalf of Herff Jones was sent to as many as 50 schools that were all current accounts of Wagner serviced from Wagner's office in Edwardsville, Illinois that was managed by Kris Elliott. (Pam Elliott Depo., pp. 90-91; Kris Elliott Depo., pp. 48-49, 187).

79.　　Kris Elliott made the decision on which schools to send all of the Herff Jones solicitation letters in early January 2009, regardless of whether the letters were signed by Kris Elliott, Pam Elliott, or both of the Elliotts. (Pam Elliot Depo., p. 91).

80.　　Pam Elliott admitted that Kris Elliott wanted her to sign the Herff Jones solicitation letters to schools that he was not supposed to go into because of his non-compete agreement with Wagner and Pam Elliott agreed to do so. (Pam Elliott Depo., p. 91).

81.　　Pam Elliott admitted that she signed solicitation letters on behalf of Herff Jones at the request and direction of Kris Elliott. (Pam Elliott Depo., pp. 97-98).

### Solicitation of Schools Covered by the Non-Competition Agreement and the Elliotts' Obtaining of Contracts for Herff Jones from Existing Wagner Accounts

82.　　During a meeting on August 22, 2008, Kris Elliott provided to Herff Jones a copy of his non-compete agreement with Wagner. (Kris Elliott Depo., p. 82).

83.　　Before resigning from Wagner, Pam Elliott and Kris Elliott met with representatives of Herff Jones and discussed having Pam Elliott solicit business from schools

covered by the non-competition restriction between Kris Elliott and Wagner, instead of Kris Elliott doing so. (Kris Elliott Depo., p. 85; Pam Elliott Depo., pp. 141-43).

84.     It was Kris Elliott's idea to have Pam Elliot solicit business from schools covered by Kris Elliott's non-compete agreement with Wagner. That idea was agreed to and accepted by the executives of Herff Jones. (Kris Elliott Depo., p. 85).

85.     Kris Elliott did not visit particular schools on behalf of Herff Jones because they were in the counties that are listed in his non-compete agreement with Wagner. (Kris Elliott Depo., p. 44). As a result, Kris Elliott sent Pam Elliott into the schools covered by his non-competition agreement with Wagner to solicit business for Herff Jones. (Kris Elliott Depo., p. 46).

86.     At Kris Elliott's directive, Pam Elliott obtained 21 contracts for Herff Jones during the week of January 5 through January 9, 2009, after she had sent various CDs of Wagner's photography to such schools and had sent a solicitation letter to the same schools on behalf of her and her husband, Kris Elliott. (Plaintiff's Exhibits 62 and 63).

87.     Pam Elliott signed all 21 of the contracts that she obtained on behalf of Herff Jones in early January 2009, instead of Kris Elliott doing so, out of concern about the non-compete Kris Elliott has with Wagner. (Pam Elliott Depo., p. 180).

88.     All of the schools that Pam Elliott went to on behalf of Herff Jones from January 5 through January 9, 2009 had been doing business with Wagner and were current accounts of Wagner. (Pam Elliott Depo., p. 85). In fact, Pam Elliott obtained contracts, on behalf of Herff Jones, from schools that were already under contract with Wagner to provide the same photography business for the Spring 2009. (Pam Elliott Depo., p. 54; Plaintiff's Exhibits 50 and 51).

89.     Pam Elliott provided Kris Elliott with the 21 contracts that she obtained on behalf of Herff Jones from customers of Wagner.  (Kris Elliott Depo., p. 48).

90.     Kris Elliott likewise admitted that all of the 21 accounts from which Pam Elliott obtained contracts for Herff Jones were handled out of Wagner's office in 2008 and that Kris Elliott had been the salesperson at Wagner for all of those same accounts.  (Kris Elliott Depo., pp. 48-48, 187).

91.     Kris Elliott admitted that he believed that he and his wife had the right, on behalf of Herff Jones, to obtain contracts from schools currently under contract with Wagner for the same photography business even when he had full and actual knowledge that such schools were under contract with Wagner to do the same photography business that was being solicited and obtained on behalf of Herff Jones by and through Kris and Pam Elliott.  (Kris Elliott Depo., pp. 107-08).   For example, Kris Elliott knew that Pam Elliott was soliciting business from Collinsville High School, on behalf of Herff Jones, and that Collinsville High School was already had an existing contract with Wagner.  (Kris Elliott Depo., p. 103).

92.     Kris Elliott and Pam Elliott developed a plan as far as which one of them would solicit business from schools because of the non-compete agreement between Kris Elliott and Wagner.  (Pam Elliott Depo., p. 56; Kris Elliott Depo., pp. 45-46).

93.     When Pam Elliott went to schools to solicit business on behalf of Herff Jones the week of January 5 through January 9, 2009, Pam Elliott introduced herself and inquired of whether each school received the solicitation letter announcing that both Pam Elliott and Kris Elliott were now with Herff Jones.  (Pam Elliott Depo., p. 57).

94.     For every school solicited by Pam Elliott on behalf of Herff Jones during the week of January 5 through January 9, 2009, Pam Elliott communicated the message that both she

and Kris Elliott were no longer with Wagner and that both of them were now with Herff Jones. (Pam Elliott Depo., pp. 84-85).

95.    Pam Elliott signed all 21 contracts obtained from current Wagner school accounts, on behalf of Herff Jones, instead of Kris Elliott doing so out of concern about the non-compete Kris Elliott had with Wagner.  (Pam Elliott Depo., p. 180).

96.    Since his employment with Wagner ended on December 31, 2008, Kris Elliott has also directly solicited, on behalf of Herff Jones, accounts of Wagner that were part of the Elliott Territory as of December 31, 2008.  (Kris Elliott Depo., p. 41, pp. 65-67; Plaintiff's Exhibit 79).

97.    Pam Elliott admitted that the entire sequence of ordering CDs with Wagner photography work; sending those CDs to Wagner school accounts on December 30, 2008; sending solicitation letters to such Wagner school accounts; and soliciting the yearbook printing business from those same accounts the week of January 5 through January 9, 2009, was a specific plan that Pam Elliott and Kris Elliott had in connection with leaving Wagner and joining Herff Jones.  (Pam Elliott Depo., pp. 69-70).

98.    The testimony established that Wagner was unable to determine the schools with whom it had existing contracts due to the lack of documentation of school photography agreements in its Edwardsville office following the resignations of Defendants.

99.    On December 31, 2008, Kris Elliott left a hand-written note to Hal Wagner advising him that "Any contracts that were signed are in my desk drawer.  All other schools there is no written agreement we just set dates."  (Plaintiff's Exhibit 16).  Only three current photography agreements were left by Kris Elliott in the Edwardsville office when he resigned from Wagner.  (Plaintiff's Exhibit 16).

100.     As reflected by the testimony of Chip Wagner and Penny Wagner, due to the absence of current written photography agreements being left in Wagner's office in Edwardsville when the Elliotts resigned, Wagner embarrassingly sought to obtain copies of its own photography agreements from various schools within the Elliott Territory.  During that process, Wagner has been able to obtain copies of its photography contracts with Collinsville High School, Community Unit School District #1 in Charleston, Illinois, Caseyville Elementary School, Glen Carbon Elementary School and Zion Lutheran School in Staunton, Illinois.  (Plaintiff's Exhibits 48, 49, 50, 52, 53 and 54).

101.     Two of the 21 contracts obtained by Pam Elliott on behalf of Herff Jones during the week of January 5 through January 9, 2009 were for Caseyville Elementary School and Zion Lutheran School.  (Plaintiff's Exhibit 63)  Herff Jones' contracts for Caseyville Elementary School and Zion Lutheran School cover the same services already under contract with Wagner.  (Plaintiff's Exhibits 50, 51, 54 and 63).

102.     Defendant Brad Gutierrez accompanied Pam Elliott to several of her school solicitation visits on January 5, 2009 on behalf of Herff Jones and he accompanied Kris and Pam Elliott to a Herff Jones "Synergy dinner meeting" on January 6, 2009, which was also attended by Sharon Vansaghi.  (Pam Elliott Depo., pp. 56-57, 212-14; Kris Elliott Depo., pp. 69-70).

**Kris Elliott's Testimony on the Status of His Non-Compete Agreement with Wagner**

103.     This Court finds the testimony by Kris Elliott, that he believed his non-competition agreement with Wagner was not in existence because of the alleged breaches years before his employment resignation, unpersuasive and lacking in credibility.  The entire plan of Kris and Pam Elliott, set forth above and sanctioned by Herff Jones, to have Pam Elliott (instead

of Kris Elliott) solicit accounts in the territory covered by the non-compete belies any such belated assertion by Kris Elliott.

104.     Further, the Court finds that Hal Wagner did inquire of Kris Elliott about the execution of a new and revised form of Non-Competition Agreement in the Fall of 2006 and credits Hal Wagner's testimony that Kris Elliott told him that Elliott did not need to execute Wagner's revised form of Non-Compete Agreement in 2006 because "he already had one." The timing of that discussion between Kris Elliott and Hal Wagner is confirmed by the admission of the new and revised form of Non-Competition Agreement of Wagner, executed by new sales representative Don Mathenia on October 20, 2006. (Plaintiff's Exhibit 86).

105.     Thus, the Court finds that Kris Elliott acknowledged and confirmed the existence of his non-compete agreement with Hal Wagner in the Fall of 2006 and is estopped at this point from denying the validity and existence of his non-competition agreement with Wagner.

106.     Moreover, Kris Elliott completed an Employment Application with Herff Jones, dated January 5, 2009, on which Kris Elliott expressly indicated that he had a non-compete agreement "with Wagner Portrait Group," which would limit or hinder his employment with Herff Jones. (Plaintiff's Exhibit 74). Such an express acknowledgement by Kris Elliott on January 5, 2009 is consistent with the overwhelming evidence that he, Pam Elliott and Herff Jones (through Kris Elliott) agreed in 2008 to use Pam Elliott to do exactly what Kris Elliott knew he was prohibited from doing under his non-competition agreement with Wagner.

### C. Conclusions of Law

1.     To obtain a preliminary injunction, Wagner must make an initial showing that: (1) its case has a likelihood of success on the merits; (2) no adequate remedy of law exists; and (3) it will suffer irreparable harm if injunctive relief is not granted. ***See, e.g., Hodgkins ex rel.***

*Hodgkins v. Peterson*, **355 F.3d 1048, 1054-55 (7th Cir. 2004).** If Wagner meets its burden on these three requirements, then the Court considers two additional criteria: (4) whether the harm to Wagner if the injunction is wrongfully denied outweighs the harm to the Defendants if the injunction is wrongly granted, and (5) the public interest. *Cooper v. Salazar*, **196 F.3d 809, 813 (7th Cir. 1999).**

**Returning Wagner's Property and Business Documents**

2.      As a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. *Bevolo v. Carter*, **447 F.3d 979, 982 (7th Cir. 2006) (citing** *Colip v. Clare*, **26 F.3d 712, 714 (7th Cir. 1994)).** As such, the Court applies Illinois's choice-of-law rules to determine the applicable substantive law. *See Hinc v. Lime-O-Sol Company*, **382 F.3d 716, 719 (7th Cir. 2004);** *Kohler v. Leslie Hindman, Inc.*, **80 F.3d 1181, 1184 (7th Cir. 1996)**. Illinois follows the **RESTATEMENT (SECOND) OF CONFLICT OF LAWS** in making such decisions. *Midwest Grain Products of Illinois, Inc. v. Productization, Inc.*, **228 F.3d 784, 787 (7th Cir. 2000)**.

3.      In determining which state's law applies to Wagner's tort claims, the Court "select[s] the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties." *Carris v. Marriott International Inc.*, **466 F.3d 558, 560 (7th Cir. 2006) (citing** *Esser v. McIntyre*, **661 N.E.2d 1138, 1141 (Ill. 1996)).** The law of the place where the injury occurred is presumed to apply unless another state has a more significant relationship to the occurrence or parties. *Id.*; *Spinozzi v. ITT Sheraton Corp.*, **174 F.3d 842, 844 (7th Cir. 1999).** Here, the injury occurred in Illinois, as Edwardsville, Illinois is the site of the Defendants' sudden resignations, and is the location from which the documents

and property were allegedly taken. Also, most if not all of the clients in the Elliott territory are located in Illinois. Accordingly, the Court applies Illinois law to Wagner's tort claims.

4.     This Court concludes that Wagner has satisfied its burden to obtain a preliminary injunction to require Defendants to return any items of Wagner property that remain in their possession or come into their possession or control. The findings of the Court as set forth above show that Wagner is likely to succeed on the merits of its tort claims against the Elliotts based upon the breach of fiduciary and loyalty duties owed to Wagner by the Elliotts and that the Elliotts tortiously interfered with Wagner's business relationships with its customers. Even though the Elliotts appear to have made a good faith effort to return all of Wagner property, this Court finds that the Elliotts did possess and may have the opportunity to possess Wagner property in the future in violation of their duties owed to Wagner.

5.     The Court also concludes that Pam Elliott and Kris Elliott have secured new contracts for Wagner's competitor, Herff Jones, Inc., with at least 21 schools that were current customers of Wagner at the time of their resignations, including several schools that were under written photography agreements for Wagner to provide the same photography services. Thus, Wagner has established a likelihood of success on the merits of its claim that Defendants Pam and Kris Elliott tortiously interfered with their contracts and business relationships in addition to breaching their fiduciary duties owed to Wagner.

6.     The Court concludes that Wagner has no adequate remedy of law and will suffer irreparable harm if an injunction is not issued to protect Wagner against any of the Defendants' retaining possession of any Wagner property and business documents. Monetary damages would be insufficient as it would be almost impossible to calculate the extent of harm to Wagner in the

marketplace and the harm to its client relationships if Wagner is unable to carry out its contractual obligations to its various school customers.

7. This Court likewise concludes that the equities favor granting an injunction to require Defendants to return any property to Wagner. If the requested injunction is wrongfully denied, Wagner may be unable to fulfill its contractual agreements and its relationships with long-time clients may be forever damaged. Conversely, if the injunction is wrongfully granted, Defendants will be in the same position as they are now, searching for clients for its new business. The only inconvenience to be suffered by Defendants by entering the injunction to return Wagner property is that they will be required to return items they removed from Wagner's premises upon their departure or other Wagner property that comes into their possession hereafter. Thus, a preliminary injunction will merely preserve the status quo until a trial on the merits can be conducted.

8. Finally, the public's interest clearly favors granting the preliminary injunction on the return of Wagner's property. Wagner's clients have an expectation that photography and yearbook services will be performed and completed pursuant to the terms of their current contracts. The Elliotts' retention of Wagner materials makes it difficult if not impossible for Wagner to complete such tasks, and makes it difficult for the clients to know who the proper contact for the remainder of their academic year is, particularly in light of the Elliotts' sending of Wagner's photography work on December 30, 2008 to Wagner accounts and then undertaking a specific plan to attempt to solicit those same customers for purposes of printing their yearbooks on behalf of Herff Jones.

9.      Therefore, the Court grants the Motion for Preliminary Injunction insofar as Defendants are required to return any and all Wagner property, in the form of documents or other items, that remains in their possession or may come into their possession hereafter.

**Enforcement of the Covenant Not to Compete**

10.      The Court concludes that issuance of a preliminary injunction to enforce the covenant not to compete between Kris Elliott and Wagner in the Employment Agreement executed in March of 1994 is warranted.

11.      The non-competition restriction is governed by and construed under the laws of the State of Missouri, pursuant to paragraph 7 of the Employment Agreement.  (Plaintiff's Exhibit 28).  For contract claims, the Restatement and Illinois law respect a contract's choice of law clause as long as the contract is valid.  ***Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996)**.  Further, there is a reasonable basis for selection of Missouri law since Hal Wagner Studios, Inc. is headquartered in St. Louis, Missouri.

**a.  Likelihood of Success on the Merits**

12.      The Court finds that Wagner has demonstrated a likelihood of success on the merits that the covenant not to compete is enforceable.  Under Missouri law, covenants not to compete are disfavored, because they restrain trade.  ***Systematic Business Servs., Inc. v. Bratten*, 162 S.W.3d 41, 49–50 (Mo. App. Ct. 2005).**  However, the Court may uphold such agreements if the party seeking its enforcement establishes "both the necessity to protect the claimant's legitimate interests and that the agreement is reasonable as to time and space."  ***Systematic Business Servs., Inc. v. Bratten*, 162 S.W.3d 41, 50 (Mo. App. Ct. 2005).**  A business's "'stock of customers' and the company's goodwill" are considered to be legitimate interests.  ***Id.* at 49.**

13.     The Court concludes that Wagner has established that the geographic and specific client restriction, regarding accounts produced by Elliott during the term of his Employment Agreement with Wagner, is reasonable.  The evidence, including the testimony of Kris and Pam Elliott themselves, made it clear that the Elliotts obtained a multitude of accounts throughout Central and Southern Illinois, including accounts in the schools and counties identified in the covenant not to compete.  Further, the breadth of the region identified in the covenant not to compete consists of those counties and schools that were serviced in the Elliott Territory in 1994, at which time Wagner paid $245,000.00 to purchase all of Defendant Kris Elliott's assets in that territory, specifically including customer contracts, all of the customer relations and goodwill associated with the Elliott Territory, and all of the assets and properties, both tangible and intangible, used in the school photography business of Kris Elliott.  (Plaintiff's Exhibit 24, p. 2).

14.     The 18-month restriction is likewise reasonable under Missouri law.  *Silvers, Asher, Sher & McLaren, M.D.'s Neurology, P.C. v. Batchu*, **16 S.W.3d 340 (Mo. App. Ct. 2000);** *H&R Block E.Tax Services Inc. v. Ensura*, **122 F.Supp. 2d 1067 (W.D. Mo. 2000);** *Shelbina Veterinary Clinic v. Holthaus*, **892 S.W.2d 803 (Mo. App. Ct. 1995);** *Osage Glass, Inc. v. Donovan*, **693 S.W.2d 71 (Mo. banc 1985).**  Defendants provide no indication that the length of the covenant is excessive or unreasonable under Missouri law.

15.     Since the geographic and customer restrictions and duration of the non-competition restriction are reasonable and Wagner has presented substantial evidence that the non-competition agreement is necessary to protect its customer goodwill and customer relationships and contracts, the covenant not to compete is enforceable and, at this time, the Court rejects the claim of Kris Elliott that the non-compete restriction should not be enforced due to alleged "prior material breaches" by Wagner.

16.     This Court finds that the evidence currently in the record does not support Defendants' contention that Wagner breached any terms of the Employment Agreement, but rather Hal Wagner and Kris Elliott mutually agreed upon any changes to the compensation structure between Wagner and Kris Elliott during their nearly 15 years of interaction in a business and employment relationship.

17.     The Court finds Hal Wagner's testimony to be credible, and the evidence in the record does not support Kris Elliott's contention that he was intimidated into accepting any modifications to the compensation arrangement.  Kris Elliott admits that he was never threatened with any employment loss by Wagner, and Elliott's own written statements lead the Court to conclude that Elliott was not forced to enter into any compensation arrangement.  On September 10, 2002, Kris Elliott prepared his own letter to Hal Wagner and specifically stated "I believe we decided last year that the class book sales and finishing would not be included in my numbers. Those numbers are not included below."  (Plaintiff's Exhibit 30).  Kris Elliott admitted that the "we" in his September 10, 2002 letter referred to Hal Wagner and himself.

18.     On September 1, 2004, Kris Elliott wrote to the accountant for Wagner (Dan Lawrence) and stated in his own writing that "Hal and I decided on a new pay system for this year," and that "We decided that my base salary would be $90,000.00."  Elliott then set forth a specific bonus formula agreed upon with Hal Wagner, ranging from 7.5% to 20% of net sales and again specifically stated in his own words that "Net sales does not include any yearbook sales or costs."  (Plaintiff's Exhibit 31).

19.     The Court further concludes that, based on the evidence currently before it, Kris Elliott made no actual objection to any of the compensation changes that were agreed to between Kris Elliott and Hal Wagner during their extensive business and employment relationship.  As a

result, it does not appear that Kris Elliott was coerced or otherwise intimidated into accepting any alterations to the terms of the written Employment Agreement between Wagner and Kris Elliott.

20.     The Court further finds that the changes to Kris Elliott's overall compensation structure appear to have been supported by consideration from Wagner to pay Elliott a higher base salary and that a change in market conditions also supported changes to the compensation structure between Wagner and Kris Elliott.  The Court finds Hal Wagner's testimony on the consideration for modifications to the Employment Agreement compensation terms to be credible.

21.     The Court also concludes that the changes to Kris Elliott's base salary from $40,000.00 to $92,000.00 per year reflect changes to the Employment Agreement which benefited Kris Elliott directly over several years.

22.     The first change to the specific terms of the Employment Agreement was an increase in base salary from $40,000.00 to $66,300.00 per year, a benefit only to Kris Elliott. Thus, Kris Elliott received significant increases in salary, beyond the $40,000.00 required under the Employment Agreement, well before there was any agreement to modify any bonus payments to him.  Kris Elliott was the first party to accept increased benefits under the Employment Agreement, by payment of a substantially increased annual salary, and he cannot now claim that he should be able to disregard the obligations incident to his non-competition restriction in that same Employment Agreement.

23.     Kris Elliott's suggestion that his consistently paid bi-weekly salary amounts by Wagner were "draws against commissions" and not actual salary payments is rejected by the Court at this time.  No credible evidence was presented that Kris Elliott's salary increases

represented anything other than increases to his base salary. Normal employee payroll taxes were withheld from the base salary payments to Kris Elliott. He received his base salary, as increased substantially during his employment, on normal payroll dates of Wagner throughout his entire period of employment. Thus, the Court concludes that Wagner's payment to Elliott of salary amounts throughout Elliott's employment with Wagner, ranging from $40,000.00 per year as required under the Employment Agreement and concluding with $92,000.00 per year after July of 2005 through December 31, 2008, constituted salary payments to Kris Elliott, all of which were in excess of the salary required under the Employment Agreement to the extent that Elliott received annual salary payments in excess of $40,000.00 per year.

24.     Having concluded that Wagner and Elliott mutually agreed to any changes in Elliott's pay structure, the Court must further address Elliott's contention that Wagner breached the Employment Agreement in a material manner by not formalizing the compensation structure changes in a written modification to the Employment Agreement.

25.     In Missouri, an employer who breaches an employment contract may not thereafter seek enforcement of a covenant not to compete. ***Ozark Appraisal Service, Inc. v. Neale***, **67 S.W.3d 759, 764 (Mo. App. Ct. 2002) (citing *Luketich v. Goedecke, Wood & Co., Inc.*, 835 S.W.2d 504, 507 (Mo. App. Ct. 1992)).**

> A party to a contract cannot seek to enforce its benefits where he is the first to violate its terms. "[T]he question of whether an employer is precluded from enforcing a covenant not to compete as a result of its own breach is 'largely an issue of fact for the trial court.'"

***Id.*** **(quoting *Ballesteros v. Johnson*, 812 S.W.2d 217, 222 (Mo. App. Ct. 1991) (in turn, quoting *Adrian N. Baker & Co. v. DeMartino*, 733 S.W.2d 14, 17 (Mo. App. Ct. 1987))).** ***See***

*also Forms Mfg., Inc. v. Edwards*, **705 S.W.2d 67, 69 (Mo. App. Ct. 1985) ("[a] party to a contract cannot claim its benefits where he is the first to violate it.").**

26.     It is not clear whether Wagner materially breached the Employment Agreement merely because any modifications to the compensation structure were not set forth in a formalized amendment to the Employment Agreement.  First, as set forth above, Elliott was the first party to the Employment Agreement to enjoy the benefits of an increased salary beyond that required under the Employment Agreement, without there being any written modification to the Employment Agreement.  Second, there were no unilateral changes to the Employment Agreement imposed upon Elliott by Wagner and the failure to have a formalized written amendment is not material.

27.     But even if a material breach did occur, Wagner has shown a likelihood of success on the merits that Kris Elliott waived any such breach of the Employment Agreement by continuing to accept all benefits under the compensation structure agreed to between him and Wagner.

28.     Elliott cites ***Supermarket Merchandising & Supply, Inc. v. Marschuetz*, 196 S.W.3d 581 (Mo. App. Ct. 2006).**  There, the employer was a nation-wide distributor of grocery store fixtures and display racks.  Defendant served a regional sales manager and received commissions for customer sales.  His contract included a non-compete clause prohibiting him from working in the industry for two years and prohibiting him from soliciting plaintiff's customers for five years.  It also provided that no modifications to the agreement were permitted unless made by a signed writing.  During the defendant's employment, however, the employer unilaterally made changes to his contract such that defendant did not receive commissions until customers paid their invoices in full, essentially "shift[ing] the risk of customer non-payment" to

the employee.  *Id.* **at 583–84.**  The changes also provided that where an employee left the company, he would only receive commissions for those amounts that customers had already paid toward their invoices as of the employee's last day.  The defendant vehemently objected to these changes and refused to sign new agreements, though he did sign acknowledgments that he was aware of the policy change.  Defendant continued to work for nearly 2 years under the first policy change, and approximately 10 months after the policy change regarding commissions upon termination.  After he tendered his resignation, he began working for a competitor and allegedly took his former employer's biggest client with him.  The employer sought an injunction to enforce the non-compete clause.  *Id.* **at 584.**  On appeal, the court found that the unilateral changes to the defendant's contract were material breaches of the agreement because they affected the manner and amount the employee was paid.  *Id.* **at 586.**

29.     The employer argued that the defendant had ratified the changes by continuing to work and accept paychecks under the new policies, such that he should be estopped from claiming that there was a breach.  The Court rejected the argument, explaining:

> as a general rule "[a]n employee cannot repudiate the unfavorable terms of [a] modified contract when he has claimed the benefits of continued employment under it."  *Forms Mfg., Inc.*, 705 S.W.2d at 70.  However, the burden is on the employer to prove that the employee waived the employer's breach of contract.  *Id.*  In *Forms Mfg.*, this Court held that an employee did not waive his employer's prior breach of their employment contract by continuing to work for an additional six months after the breach first occurred.  *Id.*  This Court noted that the employee "voiced opposition" to his employer's unilateral change, and was not charged with waiver because he initially attempted to persuade his employer to change the policy at issue.  *Id.*  In addition, this Court noted that employee's attempts to change the policy proved futile, and employee reasonably used the remainder of the six months to secure new employment.  *Id.*

*Supermarket Merchandising*, 196 S.W.3d at 587.

30.     Here, Wagner is unable to provide written agreements signed by both parties modifying Elliott's pay structure.  Thus, it is uncontested that the parties did not comply with the contractual requirements for modifying the terms of the agreement.  Though it appears possible that Wagner breached the contract in a material way, however, Wagner has carried its burden of proving that Kris Elliott waived any breach.

31.     Unlike the defendants in ***Supermarket Merchandising*** and ***Forms Mfg.***, Elliott admits that he did not voice an objection to the modifications.  In fact, he submitted letters to Wagner's accountants in which he stated that he and Hal Wagner had actually agreed upon changes to his salary.  ***See* Pl. Exh. 30 (stating in 2002 that "we decided last year that the classbook sales and finishing would not be included in my numbers."); Pl. Exh. 31 (stating in 2004 that "Hal and I decided on a new pay system for this year.").**

32.     This Court finds Hal Wagner's version of any compensation change events credible, in light of Elliott's statements and actions.

33.     Unlike the Defendants in the cases he cites, Kris Elliott obtained a significant benefit from the modifications to his compensation arrangement, by receiving a larger salary throughout the year, though he collected a smaller bonus at the end of the year.  Conversely, Wagner paid Elliott's wages up front, rather than enjoying the benefits of this capital for the entire year before paying a lump-sum bonus.  There is an obvious benefit to Elliott and detriment to Wagner, because of the time value of money.  Due to this fact, coupled with the evidence presented in Hal Wagner's credible testimony, the Court cannot find Elliott's argument that Wagner preferred to spread out the bonus simply to avoid paying a year-end lump-sum bonus persuasive.  Giving Elliott greater and guaranteed salary payments up front would not, in and of itself, benefit Wagner.

34. It would be entirely inequitable, under the circumstances of this case and findings of this Court, to permit Kris Elliott to collect the benefit of an increased bi-weekly salary without complaint, and then avoid the covenant not to compete, by voicing an objection for the first time nearly seven years after the first modification to the compensation structure in his Employment Agreement with Wagner.

35. Accordingly, the Court finds and concludes that Wagner has shown a likelihood of success on the merits of its claims. The Court finds that the evidence before it supports Wagner's contention that Elliott waived any breach of contract.

36. This Court finds further that Elliott is likely estopped from asserting any breach of contract as a basis to block enforcement of the covenant not to compete. Consequently, Wagner has shown that it has a "better than negligible chance of succeeding" on the merits of its claim.

### b.  Inadequate Remedy at Law / Irreparable Harm

37. The Court next concludes that Wagner has no adequate remedy at law because solicitation of its clients in contravention of the covenant not to compete could deprive Wagner of its stock of customers of which Elliott has intimate knowledge. Additionally, there was evidence that the solicitation of Wagner clients has already caused a great deal of confusion among the schools with whom Wagner does business. The Court concludes that the Elliotts may have also interfered with Wagner's existing contracts by securing contracts for Herff Jones for academic semesters, during which certain schools already have written agreements with Wagner.

38. Monetary damages would be insufficient, as it would be almost impossible to calculate the extent of the harm presented under the facts of this case. The anticipated harm is irreparable because damage to client relationships and Wagner's goodwill may never be mended if the covenant is not enforced.

39.     Lastly, Wagner would be deprived of the benefit of the bargain it entered into globally with Delmar Studios and Kris Elliott in 1994, when Wagner purchased all of the assets of Elliott's photography business by payment of a substantial amount of money to acquire the Elliott Territory and all of the customer goodwill and contracts contained therein. As part of that global transaction, Kris Elliott was relieved of his debt to Delmar Studios and obtained a fresh start to manage the Elliott Territory for Wagner.

### c. The Balance of the Equities

40.     Additionally, this Court concludes that the threatened injury to Wagner outweighs the potential harm to Kris Elliott if the injunction is wrongfully granted. The balance of the equities tip strongly in favor of Wagner. If the injunction is wrongfully denied, Wagner may lose countless contracts with existing clients now and in the future. Additionally, Wagner's relationships with long-time clients may be forever damaged. Conversely, if the injunction is wrongfully denied, Elliott will still be permitted to solicit clients for Herff Jones, so long as they are not located in the prohibited territory. Moreover, Elliott has indicated that he is paid a salary from Herff Jones in the amount of $75,000.00, which does not include any bonuses that he may receive, and he has not provided any evidence as to what extent a wrongfully entered injunction would damage him economically. In any case, monetary harm can easily be quantified if the injunction is later determined to be improper.

### d. The Public's Interest

41.     Finally, the Court concludes that the public's interest clearly favors granting the preliminary injunction. As set forth in the findings above, there has been considerable evidence that a number of schools have indicated their confusion with respect to the solicitations already undertaken by the Elliotts on behalf of Herff Jones following their nearly 15 years of association

with Wagner's photography business. It is difficult for the clients to know who the proper contact for the remainder of the year actually is, and the Elliotts' new agreements (for Herff Jones) with schools who are currently under contract with Wagner may, in fact, result in a breach of contract by those schools. It is in the public interest that the schools not be placed on such precarious footing.

### e. The Scope of the Covenant Not To Compete

42.     This Court concludes that Wagner is entitled to a preliminary injunction enforcing the covenant not to compete as to both Kris and Pam Elliott, even though only Kris Elliott has a covenant not to compete in his contract.

43.     This conclusion is supported by the fact that Pam Elliott and Kris Elliott are a "two person" operation in running the exact same territory on behalf of Herff Jones, albeit expanded, that both were running together on behalf of Wagner. It is undisputed that Kris Elliott is Pam Elliott's boss and was her boss during the nearly 15 years of employment with Wagner. Accordingly, her actions with respect to the solicitation of any clients are done at the direction of Kris Elliott.

44.     Pam Elliott and Kris Elliott both testified that Kris Elliott sent Pam Elliott to Wagner schools, specifically out of concern that his personal involvement with such schools might violate the covenant not to compete with Wagner. In doing so, Pam Elliott was able to obtain 21 written contracts within five days from schools that currently have business and contractual relationships with Wagner, and the contractual time periods involved in many of those new contracts obtained on behalf of competitor Herff Jones overlap with those in Wagner's contracts.

45.     The covenant not to compete provides that Kris Elliot

will not, **directly or indirectly, (for or on behalf of himself or any other person or entity)** for a period of 18 months for the date of termination of this Agreement:

A.   Solicit or sell school photography accounts which were accounts in the Elliott Territory or were accounts produced by Elliott during the term of this Agreement;

B.   Disclose the list of the above-described school photography accounts or any part thereof, to anyone without the prior written consent of Employer;

C.   Otherwise engage in competition in any respect, with Employer for any of the above-described school photography accounts.

(Doc. 2, Exhibit A, ¶ 5; Plaintiff's Exhibit 28) (emphasis added).

46.     This Court concludes, as a matter of law, that the solicitation by Pam Elliott of school photography accounts in the Elliott Territory is imputed to Kris Elliott, because she is acting under Kris Elliott's direction and control.  Further, this Court concludes that such conduct by Pam Elliott constitutes indirect solicitation and competition for clients in the prohibited region by Kris Elliott.  Accordingly, Pam Elliott must be enjoined from violating the covenant not to compete on Kris Elliott's behalf.

47.     Consequently, the Court grants the Motion for Preliminary Injunction insofar as Kris and Pam Elliott, and anyone acting in active concert or participation with them, are enjoined from soliciting or competing for school photography accounts in the Elliott Territory, as provided by the covenant not to compete in Kris Elliott's contract with Wagner.

### f.  The Bond Requirement

48.     **FEDERAL RULE OF CIVIL PROCEDURE 65(c)** provides:

The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

The literal reading of Rule 65(c) provides that security is mandatory, and the Seventh Circuit has generally required that security be given. ***See Minnesota Power & Light Co. v. Hockett*, 14 Fed.Appx. 703, 707 (7th Cir. 2001) ("Posting such a security . . . is the cost of doing business in federal court."); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 445 (7th Cir. 1990) (explaining that Rule 65(c) "makes such security mandatory, although a number of environmental decisions . . . waive the requirement or allowing the posting of a nominal bond.").**

49.     Neither party has addressed this issue since the hearing on the TRO.   In the absence of a request by the Defendants that a higher bond be required, the Court sees no reason to alter the bond in this case.   This is especially so, in light of testimony indicating that Kris Elliott is a salaried employee at Herff Jones, and the lack of any testimony indicating the extent to which enforcement of the covenant not to compete will affect his income.   Accordingly, the Court requires Wagner to post security in the amount of $500.

50.     Wagner already posted this security when the TRO was entered (Doc. 31).

### D.  Terms of the Preliminary Injunction

Having fully considered the parties' allegations, pleadings, and arguments, and based upon the foregoing findings, the Court **ORDERS** as follows:

(1) A preliminary injunction is issued immediately.   Wagner shall post security in the amount of **$500.**   The Court notes that Wagner already posted the required security when the TRO was initially entered (Doc. 31).

(2)  Defendant Kris Elliott, and anyone acting in active concert or participation with him, specifically including, but not limited to, Defendants Pam Elliott, Brad Gutierrez, Cindy Hargrave, Phil Walker, and Sharon Vansaghi, are compelled to return any and all property of

Wagner within their possession, control, or access, including but not limited to any and all "Publication CDs" or other CDs containing any Wagner photography. Additionally, if any such items are not in Defendants' possession but any Defendant knows where they are, then the Defendant shall disclose the item's whereabouts.

(3) Defendant Kris Elliott, and anyone acting in active concert or participation with him, is enjoined from disclosing, in part or in whole, the list of school photography accounts in the Elliott Territory.

(4) Defendants Kris Elliott and Pam Elliott, and anyone acting in active concert or participation with them, are hereby enjoined from soliciting or selling school photography to any accounts or customers which were accounts in the "Elliott Territory" as defined in the Employment Agreement between Wagner and Kris Elliott. Kris and Pam Elliott and anyone acting in active concert or participation with them, are specifically enjoined from soliciting or selling school photography or otherwise engaging in competition in any manner with Wagner for any school photography business within:

> (A) the Illinois counties of Adams, Calhoun, Macoupin, Madison, Morgan, Pike, and St. Clair;
>
> (B) the following schools in the State of Missouri: Becky David Elementary School, Buder Elementary School, Central Elementary School, Commons Lane School, Crestwood Elementary School, Fairview Elementary School, Halls Ferry School, Henderson Elementary School, Jennings Senior High School, Meramec Elementary School, Northview Elementary School, St. Sebastian

School, Wedgwood Elementary School, Woodland Elementary

School, River Roads School, and St. Sebastian Sports League; and

(C) to the extent not otherwise covered by the geographic counties

of Adams, Calhoun, Macoupin, Madison, Morgan, Pike, and St.

Clair Counties, the specific accounts in Exhibit 1 attached hereto.

The Court cautions the Elliotts that it cannot envision a circumstance where Pam Elliott can

solicit businesses within the Elliott Territory without violating this Order.

(5) Defendant Kris Elliott, and anyone acting in active concert or participation with him, is

enjoined from using or disclosing any business information of Wagner, or using or disclosing any

copies of Wagner's documents, including, but not limited to, any and all "Publication CDs" or other

CDs containing any Wagner photography.

(6) This Order shall remain in full force and effect until a full trial on the merits can be

held. Currently, trial in this case is set for **9:00 a.m. on February 1, 2010**. Upon proper motion

by either party, the Court will entertain advancing the trial setting to an earlier date. Because the

Court's calendar is already congested, such a motion should be filed sooner rather than later.

**IT IS SO ORDERED.**

**DATED this 19th day of February 2009.**


s/ Michael J. Reagan
**MICHAEL J. REAGAN**
**United States District Judge**

# EXHIBIT 1

## School Name

| |
|---|
| A R Gaiff |
| Albert Cassens |
| Alternative Education |
| Alton High School |
| Alton ROTC |
| Alton Middle School |
| Ashmore Elementary |
| Ashmore School |
| Atwood Hammond High School |
| Auburn Junior |
| Beckemeyer Elementary |
| Beecher City Elementary School |
| Beecher City High School |
| Beecher City Jr. High School |
| Belle-Clair Soccer League |
| Belle Valley North School |
| Belleville East High School |
| Belleville South High School |
| Belleville YMCA |
| Benld Elementary School |
| Bethalto 6th Gr Football |
| Bethalto East High |
| Bethalto West High |
| Brighton Elementary |
| Brighton North High |
| Brighton West High |
| Brighton Little League |
| Bunker Hill High School |
| Carl Sandburg Elementary |
| Carl Sandburg High School |
| Carlinsville North High |
| Carlinville South |
| Carlinville West |
| Carrollton Grade School |
| Carrollton High School |
| Caseyville Elementary |
| Catholic Childrens Home |
| Central Elementary School |
| Charleston High School |
| Charleston Middle School |
| Civic Memorial High School |
| CMT YMCA Basketball |
| Clara Barton |

| |
|---|
| Coffeen Elementary School |
| Collinsville High School |
| Collinsville Middle School |
| Collinsville Junior High |
| Collinsville Intermediate |
| Collinsville North |
| Collinsville Raiders Football League |
| Columbus School |
| Commons Lane Elementary |
| Damiansville Elementary School |
| Delhi Elem School |
| Delhi Elementary School |
| District 7 Preschool |
| Dorchester Swim Club |
| Dorris Intermediate School |
| Dow Elementary School |
| Downtown Belleville YMCA Basketball |
| Drost Park Khoury League |
| Dupo Senior High School |
| Dupo Jr. High School |
| E. A. Vinyard |
| East Alton Wood River HS |
| East Middle School |
| East St. Louis HS |
| Ed Fulton Jr. |
| Edwardsville Parks & Recreation |
| Edwardsville Rotary Club |
| Estelle Kampmeyer |
| Fairview Elementary School |
| Fieldon Elementary |
| Fieldon School Sports |
| Fort Bowman |
| Freeburg School/Athletic Association |
| Gibault Grade |
| Gibault HS |
| Gillespie High School |
| Gillespie Middle School |
| Gilson Brown School |
| Glen Carbon Elementary |
| Glen Carbon School |
| Godfrey Elementary |
| Gore Elementary |
| Goshen Elementary |
| Governor French School |
| Granite City HS (Reunion) |
| Grafton Elementary School |
| Green County Headstart |
| Green County HS |

| |
|---|
| Greenfield Elementary |
| Greenfield Basketball |
| Greenfield High School |
| Greenville Elem |
| Halls Ferry Elementary School |
| Hanrahan Elementary |
| Harrisburg HS |
| Hartford Elem School |
| Harvard Park School |
| H.E.L.P. Day Care |
| Henderson Elementary |
| HCCDC |
| Hillsboro High |
| Hillsboro High School Sports & Dance |
| Hillsboro Jr. High School |
| Holy Cross Collinsville |
| Holy Cross Lutheran |
| Holy Ghost |
| Illini Middle School |
| Irving |
| J.B. Johnson |
| J.D. Colt School |
| J.E. Hinchcliffe |
| Jacksonville Grade |
| Jacksonville High School |
| Jaguar Cheerleaders |
| Jaguar Flag Football |
| Jaguar Football |
| Jefferson Belleville |
| Jefferson Elem Collinsville |
| Jefferson Grade School |
| Jefferson Elementary-Charleston |
| Jefferson Elementary |
| Jersey Community High School |
| Jerseyville East Elementary |
| Jerseyville East School |
| Jerseyville High School |
| Jerseyville Rec Dept |
| Jerseyville Soccer |
| Jerseyville West Elementary |
| Jerseyville Little League |
| Jerseyville West School |
| Johnathan Turner Jr. High |
| Kort Williams |
| Lamhier High School |
| Laverna Evans |
| Lerna Elem |
| Lewis and Clark Elementary |

| |
|---|
| Litchfield High School |
| Litchfield Middle School |
| Litchfield Pre K School |
| Little Cowboys Football Club |
| Livingston HS |
| Lovejoy Elem |
| Mac Murray College |
| Madison Park School |
| Maple Street |
| Marie Schaefer |
| Marine Elementary |
| Mark Twain Charleston |
| Mark Twain Elementary |
| Mark Twain High School |
| Martha Blackburn Softball |
| Maryville YMCA |
| Mc Cluer North High School |
| MacMurray College |
| McKendree College |
| Meadow Brook School |
| Meissner Jr. High School |
| Meissner School |
| Meramec Elem |
| Monroe County YMCA Basketball |
| Moye School |
| Mt. Olive Elementary School |
| Mt. Olive Grade School |
| Mt. Olive High School |
| Mt. Olive Jr. High School |
| Mt. Olive Youth Basketball |
| Murrayville Woodon School 2 |
| Murrayville Woodson Elem |
| Murrayville Woodson School |
| New Berlin High School |
| New Berlin Jr. High School |
| North Greene High School |
| North Greene High School Senior Only |
| North Greene Roodhouse |
| North Middle School |
| Northview Elementary School |
| Northwestern HS |
| O'Fallon Illinois YMCA |
| Oliver Anderson |
| Our Lady Queen of Peace Bethalto |
| Our Lady Queen of Peace Belleville |
| Out Law Baseball |
| Parkside School |
| Pittsfield High School |

| |
|---|
| Pittsford High School |
| Project Help |
| Quad City Football |
| Ramsey Elementary |
| Ramsey Grade School |
| River Roads Lutherans |
| Roxana HS |
| Russell Elementary |
| Shumway Grade School |
| Sihler School |
| Simpson |
| Smithton Middle School |
| Smithton Athletic Association |
| Southeast High School |
| SS Peter & Paul School |
| St. Boniface School |
| St. Clare Catholic School |
| St. Clare School |
| St. Francis Holy Ghost School |
| St. John the Evangelist School |
| St. John's Baptist |
| St. John's Carrollton |
| St. John's Elementary |
| St. John's Lutheran |
| St. John's School |
| St. John's Smithton |
| St. Kevin's |
| St. Mary's Brussels |
| St. Mary's Catholic School |
| St. Mary's Edwardsville |
| St. Michael's School |
| St. Paul Lutheran Pre School |
| St. Paul High |
| St. Paul's Highland |
| St. Paul's Pre-school |
| St. Paul's School |
| St. Paul's Wood River |
| St. Peter and Paul Catholic |
| St. Peter and Paul School |
| St. Peter's Elementary |
| St. Sebastian |
| Staunton Baseball/Softball League |
| Staunton Elementary |
| Staunton Grade School |
| Staunton High School |
| Staunton High School League |
| Staunton Little League |
| Staunton Soccer |

| |
|---|
| Staunton Jaguars |
| Staunton Jr. High |
| Staunton Soccer Association |
| Step by Step |
| Toddler Towne-Alton |
| Troy Day Care |
| Turner Jr. High School |
| UCC Pre-school |
| Venice School |
| Virginia School |
| West Elementary |
| West Elementary School-Alton |
| Whitehall Elem |
| Wilbur Trumpe |
| Witt Grade School |
| Wolf Ridge Education Center |
| Wolfridge School |
| Woodland Elem-Edwardsville |
| Woodland Elem - Jennings |
| Woodland Elem-St. Louis |
| Woodland St Louis |
| Woodland-Edwardsville |
| Wood River Sports |
| Worden Elementary |
| YMCA of Southwest Illinois |
| Zion Litchfield |
| Zion Lutheran School |
| Zion Lutheran School-Staunton |